ALFRED L. SNAPP & SON, INC., ET AL. *v.* PUERTO
RICO EX REL. BAREZ, SECRETARY OF LABOR AND
HUMAN RESOURCES

No. 80–1305.   Argued April 20, 1982—Decided July 1, 1982

WHITE, J., delivered the opinion of the Court, in which all other Members joined, except POWELL, J., who took no part in the decision of the case. BRENNAN, J., filed a concurring opinion, in which MARSHALL, BLACKMUN, and STEVENS, JJ., joined, *post*, p. 610.

*Thomas J. Bacas* argued the cause for petitioners. With him on the briefs was *S. Steven Karalekas*.

*Paul A. Lenzini* argued the cause and filed a brief for respondent.*

---

*Briefs of *amici curiae* urging affirmance were filed by *Francis X. Bellotti*, Attorney General, and *Anthony P. Sager*, Assistant Attorney General, for the Commonwealth of Massachusetts; by

JUSTICE WHITE delivered the opinion of the Court.

In this case, the Commonwealth of Puerto Rico seeks to bring suit in its capacity as *parens patriae* against petitioners for their alleged violations of federal law. Puerto Rico contends that those violations discriminated against Puerto Ricans and injured the Puerto Rican economy. The question presented here is whether Puerto Rico has standing to maintain this suit.

I

A

The factual background of this case involves the interaction of two federal statutes, the Wagner-Peyser Act, 48 Stat. 113, 29 U. S. C. § 49 *et seq.*, and the Immigration and Nationality Act of 1952, 66 Stat. 163, as amended, 8 U. S. C. § 1101 *et seq.* (1976 ed. and Supp. IV). The Wagner-Peyser Act was passed in 1933 in order to deal with the massive problem of unemployment resulting from the Depression. The Act establishes the United States Employment Service within the Department of Labor "[i]n order to promote the establishment and maintenance of a national system of public employment offices." 29 U. S. C. § 49. State agencies, which have been approved by the Secretary of Labor, are authorized to participate in the nationwide employment service.[1] § 49g. The Secretary is authorized to make "such rules and regulations as may be necessary" to accomplish the ends of the Act. § 49k. Federal regulations issued pursuant to that authority

---

*Robert Abrams*, Attorney General of New York, *Shirley Adelson Siegel*, Solicitor General, and *Peter Bienstock*, *Deborah Bachrach*, and *Daniel Berger*, Assistant Attorneys General, *Leroy Zimmerman*, Attorney General of Pennsylvania, *Frank P. Tuplin*, Deputy Attorney General, and *Paul E. Waters*, Executive Deputy Attorney General, for the State of New York et al.; and by *A. Douglas Melamed* for the Migrant Legal Action Program, Inc., et al.

[1] As used in the Act, the word "State" includes Puerto Rico. 29 U. S. C. § 49b(b). Puerto Rico's Department of Labor and Human Resources has been approved by the Secretary of Labor and participates in the federal-state system established by the Act.

have established an interstate clearance system to provide employers a means of recruiting nonlocal workers, when the supply of local workers is inadequate. 20 CFR § 602.2(c) (1981). If local workers are not available, a "clearance order" is sent through the Employment and Training Administration of the Department of Labor to other state agencies in order to give them an opportunity to meet the request.

Some of petitioners' obligations under the employment system established by the Wagner-Peyser Act stem from the Immigration and Nationality Act of 1952, insofar as it regulates the admission of nonimmigrant aliens into the United States. The latter Act authorizes the admission of temporary foreign workers into the United States only "if unemployed persons capable of performing such service or labor cannot be found in this country." 8 U. S. C. § 1101(a)(15)(H)(ii). The Attorney General is charged with determining whether entry of foreign workers would meet this standard, "upon petition of the importing employer." 8 U. S. C. § 1184(c). He is to make this determination "after consultation with appropriate agencies of the Government." *Ibid.* The Attorney General has delegated this responsibility to the Commissioner of Immigration and Naturalization, 8 CFR § 2.1 (1982), who, in turn, relies on the Secretary of Labor for the initial determinations. 8 CFR § 214.2(h)(3) (1982).[2] To meet this responsibility, the Secretary of Labor relies upon the employment referral system established under the Wagner-Peyser Act.

Any employer who wants to employ temporary foreign agricultural laborers must first seek domestic laborers for the openings through use of the interstate clearance system.

---

[2] "Either a certification from the Secretary of Labor or his designated representative stating that qualified persons in the United States are not available and that the employment of the beneficiary will not adversely affect the wages and working conditions of workers in the United States similarly employed, or a notice that such a certification cannot be made, shall be attached to every nonimmigrant visa petition to accord an alien a classification under section 101(a)(15)(H)(ii)." 8 CFR § 214.2(h)(3)(i) (1982).

The employer who anticipates a need for foreign laborers must file an application with the local public employment office, including a copy of the job offer. 20 CFR §§ 655.201 (a)(1), (b)(1) (1981). The application must be filed in sufficient time to allow the agency to recruit through the interstate clearance system for 60 days prior to the estimated date of the start of employment. § 655.201(c). The regulations further provide that the employer must include assurances that the job opportunity is "open to all qualified U. S. workers without regard to race, color, national origin, sex, or religion, and is open to U. S. workers with handicaps who are qualified to perform the work," and that the employer will continue to seek United States workers until the foreign workers have departed for the employer's place of employment. §§ 655.203(c), (d).[3] Finally, the regulations require that "each employer's job offer to U. S. workers must offer U. S. workers at least the same benefits which the employer is offering, intends to offer, or will afford, to temporary foreign workers." § 655.202(a). Similarly, the employer may not impose obligations or restrictions on domestic workers that are not, or will not be, imposed on foreign workers. *Ibid.*

The obvious point of this somewhat complicated statutory and regulatory framework is to provide two assurances to United States workers, including the citizens of Puerto Rico. First, these workers are given a preference over foreign workers for jobs that become available within this country. Second, to the extent that foreign workers are brought in, the working conditions of domestic employees are not to be adversely affected, nor are United States workers to be discriminated against in favor of foreign workers.

---

[3] There is a further requirement that the employer continue to provide an opportunity for employment to any qualified United States worker who applies for a position from the time the foreign workers depart for the employer's place of employment until the time that 50 percent of the period of the work contract has elapsed. 20 CFR § 655.203(e) (1981).

## B

The particular facts of this case involve the 1978 apple harvest on the east coast. That was apparently a good year for apples, resulting in a substantial need for temporary farm laborers to pick the crop. To meet this need the apple growers filed clearance orders with their state employment agencies. Through the system described above, a total of 2,318 job openings were transmitted to Puerto Rico on August 2, 1978. As of August 14, which marked the end of the 60-day "availability" period, *supra*, at 596, the Commonwealth Department of Labor had recruited 1,094 Puerto Rican workers. Puerto Rican workers for the remaining openings were subsequently recruited. As stated in Puerto Rico's complaint:

> "Of this total number of 2,318 Puerto Rican workers, only 992 actually arrived on the mainland. The remainder never left Puerto Rico because of oral advice from the United States Department of Labor requesting cancellation of remaining flights because many of the defendant growers had refused to employ Puerto Rican workers who had already arrived. Of the 992 workers who arrived at the orchards, 420 came to Virginia orchards. Of these 420 workers, fewer than 30 had employment three weeks later, the growers having refused to employ most of these workers and having dismissed most of the rest within a brief time for alleged unproductivity." App. 17–18.

Puerto Rico filed this suit on January 11, 1979, naming as defendants numerous individuals and companies engaged in the apple industry in Virginia.[4] Of the 2,318 job requests forwarded to Puerto Rico, respondent alleged that 787 of these had come from the named Virginia growers. In three counts, the complaint alleged that the defendants had vio-

---

[4] The complaint named 51 defendants: 32 apple growers and 19 officers, partners or employees of the apple growers.

lated the Wagner-Peyser Act, the Immigration and National-
ity Act of 1952, and various federal regulations implementing
those statutes, by failing to provide employment for qualified
Puerto Rican migrant farmworkers, by subjecting those
Puerto Rican workers that were employed to working condi-
tions more burdensome than those established for temporary
foreign workers,[5] and by improperly terminating employ-
ment of Puerto Rican workers. Alleging that this dis-
crimination against Puerto Rican farmworkers deprived "the
Commonwealth of Puerto Rico of its right to effectively par-
ticipate in the benefits of the Federal Employment Service
System of which it is a part" and thereby caused irreparable
injury to the Commonwealth's efforts "to promote opportuni-
ties for profitable employment for Puerto Rican laborers and
to reduce unemployment in the Commonwealth," respondent
sought declaratory relief with respect to the past practices of
petitioners and injunctive relief requiring petitioners to con-

---

[5] The theory of the complaint was that the apple growers were discrimi-
nating against the Puerto Ricans in favor of Jamaican workers. In August
1978, apple growers in several States, including Virginia, filed suit in Fed-
eral District Court seeking an injunction against the United States Secre-
tary of Labor, the Commissioner of the Immigration and Naturalization
Service, and their subordinates, to permit the recruitment and employ-
ment of foreign workers. Puerto Rico was allowed to intervene in this suit
to represent the interests of its residents in these work opportunities.
The growers complained that the federal employment service had not pro-
duced sufficient laborers to assure that the harvest, which was about to
begin, could be successfully accomplished with sufficient speed. The Dis-
trict Court issued a preliminary injunction ordering that a certain number
of foreign workers be allowed to enter this country to pick apples. *Freder-
ick County Fruit Growers Assn., Inc.* v. *Marshall*, No. 78–0086(H) (WD
Va., Aug. 31, 1978). The Jamaicans secured entry under this order. Prior
to issuing this injunction, however, the court was assured by the apple
growers that they recognized their obligation to give priority to Puerto
Rican workers, notwithstanding the court order. Puerto Rico's complaint
was founded on the charge that the apple growers failed to meet this com-
mitment and, thus, failed to meet their obligations under federal law.

form to the relevant federal statutes and regulations in the future.

Petitioners responded with a motion to dismiss, asserting that respondent lacked standing to bring this action. Although the District Court held that the Commonwealth of Puerto Rico is capable of asserting *parens patriae* interests in general, it agreed with petitioners' contention that no such action could be maintained under the circumstances of this case. In particular, the District Court relied upon the relatively small number of individuals directly involved—some 787 out of a total population of close to 3 million—and the slight impact upon the general economy of Puerto Rico that the loss of this number of temporary jobs could have.

A divided panel of the Court of Appeals for the Fourth Circuit reversed.[6] 632 F. 2d 365 (1980). The majority held that the District Court had focused too narrowly on those directly involved, ignoring those that were indirectly affected by petitioners' alleged actions. Noting the serious dimensions of the unemployment problem in Puerto Rico and the general condition of its economy,[7] the court stated that "[d]eliberate efforts to stigmatize the labor force as inferior carry a universal sting" and the "inability of the United States government . . . to grant Puerto Ricans equal treatment with other citizens or even with foreign temporary workers must certainly have an effect which permeates the entire island of Puerto Rico." *Id.*, at 370. These indirect effects on the interests of "a substantial portion of its citizenry" were sufficient, in its view, to support a *parens patriae* action. *Ibid.*

We granted certiorari to determine whether Puerto Rico could maintain a *parens patriae* action here, despite the small number of individuals directly involved. 454 U. S. 1079 (1981).

---

[6] The dissenting judge agreed with the analysis of the District Court.

[7] In September 1978, 18.5% of the adults in the Puerto Rican labor force were unemployed. Rural unemployment stood at 23%.

## II

*Parens patriae* means literally "parent of the country."[8]
The *parens patriae* action has its roots in the common-law
concept of the "royal prerogative."[9]   The royal prerogative
included the right or responsibility to take care of persons
who "are legally unable, on account of mental incapacity,
whether it proceed from 1st. nonage: 2. idiocy: or 3. lunacy:
to take proper care of themselves and their property."[10]   At
a fairly early date, American courts recognized this common-
law concept, but now in the form of a legislative prerogative:
"This prerogative of *parens patriae* is inherent in the su-
preme power of every State, whether that power is lodged in
a royal person or in the legislature [and] is a most beneficent
function . . . often necessary to be exercised in the interests
of humanity, and for the prevention of injury to those who
cannot protect themselves."   *Mormon Church* v. *United
States*, 136 U. S. 1, 57 (1890).

This common-law approach, however, has relatively little
to do with the concept of *parens patriae* standing that has de-
veloped in American law.   That concept does not involve the
State's stepping in to represent the interests of particular cit-
izens who, for whatever reason, cannot represent them-
selves.   In fact, if nothing more than this is involved—*i. e.*,
if the State is only a nominal party without a real interest of
its own—then it will not have standing under the *parens pa-
triae* doctrine.   See *Pennsylvania* v. *New Jersey*, 426 U. S.
660 (1976); *Oklahoma ex rel. Johnson* v. *Cook*, 304 U. S. 387
(1938); *Oklahoma* v. *Atchison, T. & S. F. R. Co.*, 220 U. S.

---

[8] " '*Parens patriae*,' literally 'parent of the country,' refers traditionally
to role of state as sovereign and guardian of persons under legal disability."
Black's Law Dictionary 1003 (5th ed. 1979).

[9] See *Hawaii* v. *Standard Oil Co.*, 405 U. S. 251, 257 (1972); G. Curtis,
The Checkered Career of *Parens Patriae*, 25 DePaul L. Rev. 895, 896
(1976); Black's, *supra*.

[10] J. Chitty, Prerogatives of the Crown 155 (1820), quoted in Curtis,
*supra*, at 896.

277 (1911). Rather, to have such standing the State must assert an injury to what has been characterized as a "quasi-sovereign" interest, which is a judicial construct that does not lend itself to a simple or exact definition. Its nature is perhaps best understood by comparing it to other kinds of interests that a State may pursue and then by examining those interests that have historically been found to fall within this category.

Two sovereign interests are easily identified: First, the exercise of sovereign power over individuals and entities within the relevant jurisdiction—this involves the power to create and enforce a legal code, both civil and criminal; second, the demand for recognition from other sovereigns—most frequently this involves the maintenance and recognition of borders. The former is regularly at issue in constitutional litigation. The latter is also a frequent subject of litigation, particularly in this Court:

> "The original jurisdiction of this Court is one of the mighty instruments which the framers of the Constitution provided so that adequate machinery might be available for the peaceful settlement of disputes between States and between a State and citizens of another State. . . . The traditional methods available to a sovereign for the settlement of such disputes were diplomacy and war. Suit in this Court was provided as an alternative." *Georgia* v. *Pennsylvania R. Co.*, 324 U. S. 439, 450 (1945).

Not all that a State does, however, is based on its sovereign character. Two kinds of nonsovereign interests are to be distinguished. First, like other associations and private parties, a State is bound to have a variety of proprietary interests. A State may, for example, own land or participate in a business venture. As a proprietor, it is likely to have the same interests as other similarly situated proprietors. And like other such proprietors it may at times need to pur-

sue those interests in court. Second, a State may, for a variety of reasons, attempt to pursue the interests of a private party, and pursue those interests only for the sake of the real party in interest. Interests of private parties are obviously not in themselves sovereign interests, and they do not become such simply by virtue of the State's aiding in their achievement. In such situations, the State is no more than a nominal party.

Quasi-sovereign interests stand apart from all three of the above: They are not sovereign interests, proprietary interests, or private interests pursued by the State as a nominal party. They consist of a set of interests that the State has in the well-being of its populace. Formulated so broadly, the concept risks being too vague to survive the standing requirements of Art. III: A quasi-sovereign interest must be sufficiently concrete to create an actual controversy between the State and the defendant. The vagueness of this concept can only be filled in by turning to individual cases.

That a *parens patriae* action could rest upon the articulation of a "quasi-sovereign" interest was first recognized by this Court in *Louisiana* v. *Texas,* 176 U. S. 1 (1900). In that case, Louisiana unsuccessfully sought to enjoin a quarantine maintained by Texas officials, which had the effect of limiting trade between Texas and the port of New Orleans. The Court labeled Louisiana's interest in the litigation as that of *parens patriae,* and went on to describe that interest by distinguishing it from the sovereign and proprietary interests of the State:

> "Inasmuch as the vindication of the freedom of interstate commerce is not committed to the State of Louisiana, and that State is not engaged in such commerce, the cause of action must be regarded not as involving any infringement of the powers of the State of Louisiana, or any special injury to her property, but as asserting that the State is entitled to seek relief in this way because the

matters complained of affect her citizens at large." *Id.*, at 19.[11]

Although Louisiana was unsuccessful in that case in pursuing the commercial interests of its residents, a line of cases followed in which States successfully sought to represent the interests of their citizens in enjoining public nuisances. *North Dakota* v. *Minnesota*, 263 U. S. 365 (1923); *Wyoming* v. *Colorado*, 259 U. S. 419 (1922); *New York* v. *New Jersey*, 256 U. S. 296 (1921); *Kansas* v. *Colorado*, 206 U. S. 46 (1907); *Georgia* v. *Tennessee Copper Co.*, 206 U. S. 230 (1907); *Kansas* v. *Colorado*, 185 U. S. 125 (1902); *Missouri* v. *Illinois*, 180 U. S. 208 (1901).

In the earliest of these, *Missouri* v. *Illinois*, Missouri sought to enjoin the defendants from discharging sewage in such a way as to pollute the Mississippi River in Missouri. The Court relied upon an analogy to independent countries in order to delineate those interests that a State could pursue in federal court as *parens patriae*, apart from its sovereign and proprietary interests:[12]

"It is true that no question of boundary is involved, nor of direct property rights belonging to the complainant State. But it must surely be conceded that, if the health and comfort of the inhabitants of a State are threatened,

---

[11] Justice Harlan, in a concurring opinion, specifically rejected the idea that Louisiana had standing to pursue more than its sovereign and proprietary interests: "I am of opinion that the State of Louisiana, in its sovereign or corporate capacity, cannot bring any action in this court on account of the matters set forth in its bill. The case involves no property interest of that State. Nor is Louisiana charged with any duty, nor has it any power, to regulate interstate commerce." 176 U. S., at 24.

[12] Admittedly, the discussion here and in the other cases discussed below focused on the *parens patriae* question in the context of a suit brought in the original jurisdiction of this Court. There may indeed be special considerations that call for a limited exercise of our jurisdiction in such instances; these considerations may not apply to a similar suit brought in federal district court.

the State is the proper party to represent and defend them. If Missouri were an independent and sovereign State all must admit that she could seek a remedy by negotiation, and, that failing, by force. Diplomatic powers and the right to make war having been surrendered to the general government, it was to be expected that upon the latter would be devolved the duty of providing a remedy and that remedy, we think, is found in the constitutional provisions we are considering." *Id.*, at 241.

This analogy to an independent country was also articulated in *Georgia* v. *Tennessee Copper Co., supra,* at 237, a case involving air pollution in Georgia caused by the discharge of noxious gasses from the defendant's plant in Tennessee. Justice Holmes, writing for the Court, described the State's interest under these circumstances as follows:

"[T]he State has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain. It has the last word as to whether its mountains shall be stripped of their forests and its inhabitants shall breathe pure air. It might have to pay individuals before it could utter that word, but with it remains the final power. . . .

". . . When the States by their union made the forcible abatement of outside nuisances impossible to each, they did not thereby agree to submit to whatever might be done. They did not renounce the possibility of making reasonable demands on the ground of their still remaining *quasi*-sovereign interests."

Both the Missouri case and the Georgia case involved the State's interest in the abatement of public nuisances, instances in which the injury to the public health and comfort was graphic and direct. Although there are numerous examples of such *parens patriae* suits, *e. g., North Dakota* v. *Minnesota, supra* (flooding); *New York* v. *New Jersey, supra*

(water pollution); *Kansas* v. *Colorado*, 185 U. S. 125 (1902) (diversion of water), *parens patriae* interests extend well beyond the prevention of such traditional public nuisances.

In *Pennsylvania* v. *West Virginia*, 262 U. S. 553 (1923), for example, Pennsylvania was recognized as a proper party to represent the interests of its residents in maintaining access to natural gas produced in West Virginia:

> "The private consumers in each State . . . constitute a substantial portion of the State's population. Their health, comfort and welfare are seriously jeopardized by the threatened withdrawal of the gas from the interstate stream. This is a matter of grave public concern in which the State, as representative of the public, has an interest apart from that of the individuals affected. It is not merely a remote or ethical interest but one which is immediate and recognized by law." *Id.*, at 592.

The public nuisance and economic well-being lines of cases were specifically brought together in *Georgia* v. *Pennsylvania R. Co.*, 324 U. S. 439 (1945), in which Georgia alleged that some 20 railroads had conspired to fix freight rates in a manner that discriminated against Georgia shippers in violation of the federal antitrust laws:

> "If the allegations of the bill are taken as true, the economy of Georgia and the welfare of her citizens have seriously suffered as the result of this alleged conspiracy. . . . [Trade barriers] may cause a blight no less serious than the spread of noxious gas over the land or the deposit of sewage in the streams. They may affect the prosperity and welfare of a State as profoundly as any diversion of waters from the rivers. . . . Georgia as a representative of the public is complaining of a wrong which, if proven, limits the opportunities of her people, shackles her industries, retards her development, and relegates her to an inferior economic position among her

sister States. These are matters of grave public concern in which Georgia has an interest apart from that of particular individuals who may be affected." *Id.*, at 450–451.[13]

---

[13] The Court also said, 324 U. S., at 450, 451–452:

"It seems to us clear that under the authority of these cases Georgia may maintain this suit as *parens patriae* acting on behalf of her citizens though here, as in *Georgia* v. *Tennessee Copper Co.*, [206 U. S., at] 237, we treat the injury to the State as proprietor merely as a 'makeweight.' The original jurisdiction of this Court is one of the mighty instruments which the framers of the Constitution provided so that adequate machinery might be available for the peaceful settlement of disputes between States and between a State and citizens of another State. See *Missouri* v. *Illinois*, [180 U. S., at] 219–224; *Virginia* v. *West Virginia*, 246 U. S. 565, 599. Trade barriers, recriminations, intense commercial rivalries had plagued the colonies. The traditional methods available to a sovereign for the settlement of such disputes were diplomacy and war. Suit in this Court was provided as an alternative. *Missouri* v. *Illinois*, *supra*, p. 241; *Georgia* v. *Tennessee Copper Co.*, *supra*, p. 237.

.        .        .        .        .

"*Oklahoma* v. *Atchison*, *T. & S. F. R. Co.*, [220 U. S. 277 (1911)], is not opposed to this view. In that case, the defendant railroad company had obtained a grant from Congress to locate and maintain a railway line through the Indian Territory out of which the State of Oklahoma was later formed. The federal act provided certain maximum transportation rates which the company might charge. Oklahoma sued to cancel the grant, to have the property granted decreed to be in the State of Oklahoma as *cestui que trust*, to enjoin the defendant from operating a railroad in the State, and to enjoin *pendente lite* the exaction of greater rates than the maximum rates specified. The Court construed the Act of Congress as subjecting the rates to federal control until the territory became a part of a State, at which time the rates became subject to state control. The Court held that our original jurisdiction could not be invoked by a State merely because its citizens were injured. We adhere to that decision. It does not control the present one. This is no attempt to utilize our original jurisdiction in substitution for the established methods of enforcing local law. This is not a suit in which a State is a mere nominal plaintiff, individual shippers being the real complainants. This is a suit in which Georgia asserts claims arising out of federal laws and the gravamen of which runs far beyond the claim of damage to individual shippers."

This summary of the case law involving *parens patriae* actions leads to the following conclusions. In order to maintain such an action, the State must articulate an interest apart from the interests of particular private parties, *i. e.*, the State must be more than a nominal party. The State must express a quasi-sovereign interest. Although the articulation of such interests is a matter for case-by-case development—neither an exhaustive formal definition nor a definitive list of qualifying interests can be presented in the abstract—certain characteristics of such interests are so far evident. These characteristics fall into two general categories. First, a State has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general. Second, a State has a quasi-sovereign interest in not being discriminatorily denied its rightful status within the federal system.

The Court has not attempted to draw any definitive limits on the proportion of the population of the State that must be adversely affected by the challenged behavior. Although more must be alleged than injury to an identifiable group of individual residents, the indirect effects of the injury must be considered as well in determining whether the State has alleged injury to a sufficiently substantial segment of its population. One helpful indication in determining whether an alleged injury to the health and welfare of its citizens suffices to give the State standing to sue as *parens patriae* is whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers.[14]

Distinct from but related to the general well-being of its residents, the State has an interest in securing observance of

---

[14] Obviously, a State might make use of "private bills" in order to use its legislative power to aid particular individuals. If the analogy spoken of above is to this form of legislative action, then the State remains merely a nominal party from the perspective of a federal court; it has failed to articulate any general interest, apart from that of the individual involved.

the terms under which it participates in the federal system. In the context of *parens patriae* actions, this means ensuring that the State and its residents are not excluded from the benefits that are to flow from participation in the federal system. Thus, the State need not wait for the Federal Government to vindicate the State's interest in the removal of barriers to the participation by its residents in the free flow of interstate commerce. See *Pennsylvania* v. *West Virginia*, 262 U. S. 553 (1923). Similarly, federal statutes creating benefits or alleviating hardships create interests that a State will obviously wish to have accrue to its residents. See *Georgia* v. *Pennsylvania R. Co.*, 324 U. S. 439 (1945) (federal antitrust laws); *Maryland* v. *Louisiana*, 451 U. S. 725 (1981) (Natural Gas Act). Once again, we caution that the State must be more than a nominal party. But a State does have an interest, independent of the benefits that might accrue to any particular individual, in assuring that the benefits of the federal system are not denied to its general population.

We turn now to the allegations of the complaint to determine whether they satisfy either or both of these criteria.[15]

## III

The complaint presents two fundamental contentions. First, it alleges that the petitioners discriminated against Puerto Ricans in favor of foreign laborers. Second, it alleges that Puerto Ricans were denied the benefits of access to domestic work opportunities that the Wagner-Peyser Act and the Immigration and Nationality Act of 1952 were designed to secure for United States workers. We find each of these allegations to fall within the Commonwealth's quasi-sovereign interests and, therefore, each will support a *parens patriae* action.

---

[15] Although we have spoken throughout of a "State's" standing as *parens patriae,* we agree with the lower courts and the parties that the Commonwealth of Puerto Rico is similarly situated to a State in this respect: It has a claim to represent its quasi-sovereign interests in federal court at least as strong as that of any State.

Petitioners contend that at most there were only 787 job opportunities at stake in Virginia and that this number of temporary jobs could not have a substantial direct or indirect effect on the Puerto Rican economy. We believe that this is too narrow a view of the interests at stake here. Just as we have long recognized that a State's interests in the health and well-being of its residents extend beyond mere physical interests to economic and commercial interests, we recognize a similar state interest in securing residents from the harmful effects of discrimination. This Court has had too much experience with the political, social, and moral damage of discrimination not to recognize that a State has a substantial interest in assuring its residents that it will act to protect them from these evils. This interest is peculiarly strong in the case of Puerto Rico simply because of the unfortunate fact that invidious discrimination frequently occurs along ethnic lines. Puerto Rico's situation differs somewhat from the States in this regard—not in theory but in fact—simply because this country has for the most part been spared the evil of invidious discrimination based on state lines. Were this to come to pass, however, we have no doubt that a State could seek, in the federal courts, to protect its residents from such discrimination to the extent that it violates federal law. Puerto Rico claims that it faces this problem now. Regardless of the possibly limited effect of the alleged financial loss at issue here, we agree with the Court of Appeals that "[d]eliberate efforts to stigmatize the labor force as inferior carry a universal sting." 632 F. 2d, at 370.

Alternatively, we find that Puerto Rico does have *parens patriae* standing to pursue the interests of its residents in the Commonwealth's full and equal participation in the federal employment service scheme established pursuant to the Wagner-Peyser Act and the Immigration and Nationality Act of 1952. Unemployment among Puerto Rican residents is surely a legitimate object of the Commonwealth's concern. Just as it may address that problem through its own legislation, it may also seek to assure its residents that they will

have the full benefit of federal laws designed to address this problem. The Commonwealth's position in this respect is not distinguishable from that of Georgia when it sought the protection of the federal antitrust laws in order to eliminate freight rates that discriminated against Georgia shippers, *Georgia* v. *Pennsylvania R. Co., supra,* or from that of Maryland when it sought to secure the benefits of the Natural Gas Act for its residents, *Maryland* v. *Louisiana, supra.* Indeed, the fact that the Commonwealth participates directly in the operation of the federal employment scheme makes even more compelling its *parens patriae* interest in assuring that the scheme operates to the full benefit of its residents.[16]

For these reasons, the judgment of the Court of Appeals is

*Affirmed.*

JUSTICE POWELL took no part in the decision of this case.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL, JUSTICE BLACKMUN, and JUSTICE STEVENS join, concurring.

As the Court notes, *ante,* at 603, n. 12, the question whether a State can bring a *parens patriae* action within the original jurisdiction of this Court may well turn on considerations quite different from those implicated where the State

---

[16] A State does not have standing as *parens patriae* to bring an action against the Federal Government. *Massachusetts* v. *Mellon,* 262 U. S. 447, 485–486 (1923) ("While the State, under some circumstances, may sue in that capacity for the protection of its citizens (*Missouri* v. *Illinois,* 180 U. S. 208, 241), it is no part of its duty or power to enforce their rights in respect of their relations with the Federal Government. In that field it is the United States, and not the State, which represents them as *parens patriae*"). Here, however, the Commonwealth is seeking to secure the federally created interests of its residents against private defendants. Indeed, the Secretary of Labor has represented that he has no objection to Puerto Rico's standing as *parens patriae* under these circumstances. See Brief for the Secretary of Labor as *Amicus Curiae* in *Puerto Rico* v. *Bramkamp,* No. 724, Docket 79–7777 (CA2).

seeks to press a *parens patriae* claim in the district courts. The Framers, in establishing original jurisdiction in this Court for suits "in which a State shall be a Party," Art. III, § 2, cl. 2, and Congress, in implementing the grant of original jurisdiction with respect to suits between States, 28 U. S. C. § 1251(a) (1976 ed., Supp. IV), may well have conceived of a somewhat narrower category of cases as presenting issues appropriate for initial determination in this Court than the full range of cases to which a State may have an interest cognizable by a federal court. The institutional limits on the Court's ability to accommodate such suits accentuates the need for more restrictive access to the original docket. In addition, because the judicial power of the United States does not extend to suits "commenced or prosecuted against one of the United States by Citizens of another State," U. S. Const., Amdt. 11, where one State brings a suit *parens patriae* against another *State*, a more circumspect inquiry may be required in order to ensure that the provisions of the Eleventh Amendment are not being too easily circumvented by the device of the State's bringing suit on behalf of some private party. Of course, none of the concerns that might counsel for a restrictive approach to the question of *parens patriae* standing is present in this case.

In cases such as the present one, I can discern no basis either in the Constitution or in policy for denying a State the opportunity to vindicate the federal rights of its citizens. At the *very* least, the prerogative of a State to bring suits in federal court should be commensurate with the ability of private organizations. A private organization may bring suit to vindicate its own concrete interest in performing those activities for which it was formed. *E. g., Havens Realty Corp.* v. *Coleman,* 455 U. S. 363, 378–379 (1982);[1] *Arlington Heights*

---

[1] Indeed, in *Havens* we held that interference with HOME's "ability to provide counseling and referral services," 455 U. S., at 379, provided it with standing to vindicate claims under the Fair Housing Act of 1968. In this case, the alleged violations of the Wagner-Peyser Act, 29 U. S. C. § 49

v. *Metropolitan Housing Dev. Corp.*, 429 U. S. 252, 263 (1977); *NAACP* v. *Button*, 371 U. S. 415, 428 (1963). See also *Gladstone, Realtors* v. *Village of Bellwood*, 441 U. S. 91, 109–111 (1979) (standing of municipality premised on diminished tax base and other "harms flowing from the realities of a racially segregated community"). Cf. *Sierra Club* v. *Morton*, 405 U. S. 727, 739 (1972).[2]   There is no doubt that Puerto Rico's interest in this litigation compares favorably to interests of the private organizations, and municipality, in the cases cited above.

More significantly, a State is no ordinary litigant. As a sovereign entity, a State is entitled to assess its needs, and decide which concerns of its citizens warrant its protection and intervention. I know of nothing—except the Constitution or overriding federal law—that might lead a federal court to superimpose its judgment for that of a State with respect to the substantiality or legitimacy of a State's assertion of sovereign interest.

With these considerations in mind, I join the opinion of the Court.

---

*et seq.*, directly interfere with Puerto Rico's ability to perform the job referral service that it has undertaken as part of its sovereign responsibility to its citizens.

[2] A private organization may also maintain a federal-court action on behalf of its members. *E. g.*, *NAACP* v. *Button*, 371 U. S. 415, 428 (1963); *National Motor Freight Assn.* v. *United States*, 372 U. S. 246 (1963) *(per curiam)*. See *Hunt* v. *Washington State Apple Advertising Comm'n*, 432 U. S. 333, 341–345 (1977).