ALASKA SPORT FISHING ASSOCIATION; Allen Tigert; Joseph Klouda; William E. Simmons; Zenas "Ed" Zeine, Plaintiffs–Appellants,

v.

EXXON CORPORATION, et al., Defendants–Appellees.

No. 93–35852.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 13, 1994.

Decided Aug. 23, 1994.

---

Geoffrey Y. Parker, Richard A. Jameson & Associates, Anchorage, Alaska, for plaintiffs-appellants.

E. Edward Bruce, Covington & Burling, Washington, DC, for defendants-appellees.

Before: GOODWIN, D.W. NELSON, and HALL, Circuit Judges.

PER CURIAM:

Alaska Sportfishing Association and four individual sportfishers (hereinafter "plaintiffs" or "sportfishers") appeal the dismissal of their class action complaint against Exxon Corporation, et al., seeking damages for loss of use and enjoyment of natural resources resulting from the 1989 *Exxon Valdez* oil spill. The district court held that the doctrine of *res judicata* barred the sportfishers from pursuing public loss of use claims because a Consent Decree entered into by the state of Alaska, the United States government, and Exxon had settled all such public claims. The court also dismissed the plaintiffs' claims on the ground that they had failed to allege private, individual injuries and thus, had failed to state a claim for relief. We affirm.

## I.

Plaintiffs filed this action in June 1989 in Alaska Superior Court on behalf of a class of an estimated 130,000 recreational sportfishers who used Prince William Sound and other areas affected by the *Exxon Valdez* oil spill. The action sought injunctive relief and monetary damages "to provide for an environmental mitigation and monitoring fund." *Alaska Sportfishing Ass'n v. Alyeska Pipeline Serv.,* No. 3AN–89–5188 (Alaska Super.Ct.1989). The complaint asserted a variety of causes of action, including negligence, nuisance, and violation of the state statute imposing strict liability for release of hazardous substances, Alaska Stat. § 46.03.822 *et seq.*

The sportfishers' action was later consolidated with a similar one filed by the National Wildlife Federation (NWF) and several other environmental groups, (hereinafter "conservation trust plaintiffs"), who also sought to establish a conservation fund to remedy ecosystem damage caused by the spill. *National Wildlife Fed. v. Exxon Corp.,* No. 3AN89–6957 (Alaska Super.Ct.1989). Exxon subsequently removed this case and the other consolidated state court actions to federal court.[1]

In March 1991, the United States and the state of Alaska (hereinafter "the governments") also filed suit against Exxon in their capacities as "trustees for the public" under § 311(f) of the Clean Water Act (CWA), 33 U.S.C. § 1321(f)(5), and § 107(f)(1) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), as amended, 42 U.S.C. § 9607(f)(1). *United States v. Exxon Corp.,* No. A91–082 (D.Alaska 1991); *State of Alaska v. Exxon Corp.,* No. A91–083 (D.Alaska 1991). The governments sought damages for restoration of the environment and compensation for lost public uses of natural resources.

The governments subsequently entered into a settlement agreement and consent decree with Exxon (hereinafter "Consent Decree"), which the district court approved in October 1991. In the decree, Exxon agreed to pay the governments at least $900 million (and possibly an additional $100 million) for natural resource and other damages. In return, the governments released Exxon, and provided covenants not to sue, "with respect to any and all civil claims," including all claims for natural resource damages. Consent Decree at 3, ¶¶ 8, 13, 17, 18. Exxon agreed to pay for "natural resource damage," which is defined as:

*compensatory and remedial relief* recoverable by the Governments in their capacity as trustees of Natural Resources on behalf of the public for injury to, destruction of, or loss of any and all Natural Resources … whether under the Clean Water Act, … . the Trans–Alaska Pipeline Authorization Act, … , or any federal or state statute or maritime or common law relating to the environment, including (1) costs of damage assessment, (2) compensation for loss, injury … *loss of use value,* nonuse value, option value, amenity value, bequest value, existence value, consumer surplus, economic rent, or any similar value of Natural Resources.

Consent Decree at ¶ 6(d) (emphasis added). In 1992, Exxon moved for summary judgment against the sportfishers and the NWF plaintiffs, arguing that the Consent Decree precluded any additional natural resource damages or other relief regarding lost *public* uses of natural resources. The district court granted Exxon's motion, ruling that: (1) the conservation trust plaintiffs were in privity with the governments in entering into the Consent Decree; and (2) the doctrine of *res judicata* precluded further claims for public relief. Dist.Ct.Order No. 125 (Jan. 19, 1993).

Because the sportfishers' complaint asserted "individual, private claims for loss of use of natural resources," the court gave them an opportunity to amend their complaint "to better allege their uniquely private claims." Dist.Ct.Order No. 125, at 12. Plaintiffs filed an amended class action in February 1993;

---

**1.** As the basis for its removal petition, Exxon alleged that the complaints represented a collateral attack on a federal court judgment. We recently upheld the district court's removal decision in *Eyak Native Village v. Exxon Corp.,* 25 F.3d 773 (9th Cir.1994). The Alaska Sportfishing Association was among the plaintiffs in *Eyak Native Village.*

however, the court found that it failed to allege private claims, and dismissed it.[2] Plaintiffs appealed.

## II.

■ The first issue is whether the governments of the United States and Alaska, acting as trustees for the public under the CWA and CERCLA, have authority to recover for all lost-use damages caused by the oil spill. Plaintiffs contend that under regulations promulgated by the Department of Interior (DOI) under CERCLA,[3] trustees can recover only for "residual" resource injury, and thus cannot recover damages for public loss of use and enjoyment that occurs prior to "recovery," or cleanup. They argue that because government trustees are unauthorized to recover for pre-cleanup, lost-use damages, they should be allowed, as members of the sport-fishing public, to recover for such damages. For example, they argue that "[t]he sport fisher, if he or she has a legally cognizable claim, has a distinct claim for loss of use of the injured beach and water before and while they were being cleaned." Appellant's Br. at 16.[4]

However, plaintiffs' argument relies on a strained and hypertechnical reading of the DOI regulations that is inconsistent with the statutes, the policy underlying them, their legislative history, and the relevant case law. *See* H.R. No. 253, 99th Cong., 1st Sess., pt. 4, at 50 (1985) (noting that trustees may seek a "total amount of damages [that] may include ... the value of *all* the lost uses of the damaged resources ... *from the time of the release up to the time of restoration.*") (em-

phasis added); *Ohio v. United States Dep't of the Interior,* 880 F.2d 432, 454 & n. 34 (D.C.Cir.1989) (damages contemplated by CERCLA "will normally include restoration costs at a minimum, *plus interim lost-use value* in appropriate cases.") (emphasis added). Even the DOI regulations themselves, when read in their entirety, demonstrate that the government trustees are entitled to recover for all lost-use damages on behalf of the public, from the time of any release until restoration. *See* 43 C.F.R. §§ 11.81(b), 11.-14(gg), 11.15(a)(1)(ii) (trustee damages "may include any diminution of use values ... occurring during the recovery period," which extends from the time of the release until full restoration).

Moreover, if we were to accept plaintiffs' argument, the result would be to severely limit the amount of damages government trustees could recover on behalf of the public in future environmental disasters. Given the restorative purposes behind the CWA and CERCLA, it simply makes no sense to reserve a portion of lost-use damages for recovery by private parties. Unlike trustees, private parties are not bound to use recovered sums for the restoration of natural resources, or the acquisition of equivalent resources. *See* CWA § 311(f)(5), 33 U.S.C. § 1321(f)(5). Finally, plaintiffs apparently miss the point that lost-use damages incurred by the public prior to cleanup are damages that, in a layman's terms, remain on the debit side of the ledger after cleanup, and are, in fact, unredressed damages for which the trustees may recover. *See also* Dist.Ct.Order 153, at 6 ("What plaintiffs ignore is that the residual

---

2. In its ruling, the district court explained: "The sport fishermen do not allege that the spill caused harm to their boats, fishing tackle, or other equipment. The sport fishermen do not allege that they incurred expenses because a specific fishing or camping trip had to be cancelled.... The court is convinced that the sport fishermen were unable to allege private claims because these plaintiffs suffered no private injury." Dist.Ct.Order No. 146, at 6, 15 (July 8, 1993).

3. The regulations, entitled "Natural Resource Damage Assessments" (NRDA), are codified at 43 C.F.R. §§ 11.10–11.93 (1987). In support of their argument, plaintiffs specifically cite 43 C.F.R. §§ 11.10, 11.15(a)(1)(ii), and 11.84(c)(2).

4. Put into monetary terms, plaintiffs point out that cleanup in the *Exxon Valdez* spill occurred between 1989 to 1991, and Exxon's experts measured damages for recreational loss in sport fishing, pleasure boating, hiking/viewing and sport hunting at $3.8 million for 1989. Appellant's Br. at 20. If response/cleanup was completed by 1990, as Exxon claims, then "that is $3.8 million the governments could not pursue [in natural resource damages] and these plaintiffs can." *Id.* They also note that their own experts measured the damages between $19.7 million and $43.1 million. *Id.* at 20–21.

injury would be the lost use values themselves.").

## III.

■ Plaintiffs next contend that the district court erred in dismissing their complaint under the doctrine of *res judicata.* The court held that the sport fishermen may not assert lost recreational use claims on behalf of the public because such claims were already resolved in the Exxon settlement and Consent Decree. Dist.Ct.Order No. 125, at 15. We review the district court's ruling *de novo, E & J Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1287 (9th Cir.1992), and we affirm.

■ In order for a judgment in a prior suit to create a *res judicata* bar of a subsequent suit, the second suit must involve the "same parties or their privies based on the same cause of action." *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979); *accord Peck v. Commissioner,* 904 F.2d 525, 527 n. 3 (9th Cir.1990) (citing *Parklane* ).

### A. *Privity of Parties*

■ The district court concluded that the plaintiffs were privies of the governments under the *parens patriae* doctrine. Dist.Ct.Order No. 125, at 16–17. This ruling was not in error. State governments may act in their *parens patriae* capacity as representatives for all their citizens in a suit to recover damages for injury to a sovereign interest. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592, 607, 102 S.Ct. 3260, 3268, 73 L.Ed.2d 995 (1982). A state has a sovereign interest in natural resources within its boundaries. *Maine v. M/V Tamano,* 357 F.Supp. 1097, 1099–1100 (D.Me.1973). Under the *parens patriae* doctrine, "a state that is a party to a suit involving a matter of sovereign interest is presumed to represent the interests of all its citizens." *Environmental Defense Fund, Inc. v. Higginson,* 631 F.2d 738, 740 (D.C.Cir.1979). There is a presumption that the state will adequately represent the position of its citizens. *United States v. Olin Corp.,* 606 F.Supp. 1301, 1305 (N.D.Ala.1985).

Here, the Consent Decree specifically provides that the governments were acting in all capacities for their citizens. *See* Consent Decree, at ¶¶ 2–3. Thus, the sportfishers here, as members of the public, were "parties" to the federal suit within the meaning of *res judicata. See Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 692 n. 32, 99 S.Ct. 3055, 3078 n. 32, 61 L.Ed.2d 823 (1979) (citing *Tacoma v. Taxpayers,* 357 U.S. 320, 340–41, 78 S.Ct. 1209, 1220–21, 2 L.Ed.2d 1345 (1958)).

### B. *Identity of Issues*

■ For *res judicata* to operate, there must also be a substantial identity between the issues in controversy in both suits. *Satsky v. Paramount Communications, Inc.,* 7 F.3d 1464, 1467 (10th Cir.1993). Plaintiffs argue that the cause of action it advances for pre-cleanup lost uses was not at issue in the suits filed by the state of Alaska or the United States government. With respect to the pre-cleanup loss of use, they argue that "there is no 'close relationship' or substantial identity of interest or issues, between the governments and plaintiffs necessary to create privity." Appellant's Br. at 23.

However, as discussed above, government trustees do, in fact, have authority to recover for lost-use damages from the time of the oil spill to cleanup and restoration. Those are the same damages plaintiffs seek here. The Consent Decree expressly provided that damages for lost public use were covered by the decree. Thus, plaintiffs' argument that they are not barred from recovering pre-cleanup, lost-use damages must fail.

Plaintiffs next argue that the district court erred in concluding that the only claims that survive the Consent Decree were "uniquely private" tort claims. They contend that dismissal of their complaint was improper because they could state a cause of action under both the Trans–Alaska Pipeline Authorization Act, 43 U.S.C. §§ 1651–1655 ("TAPAA"), and under Alaska's statute imposing strict liability for the release of hazardous

substances, Alaska Stat. § 46.03.822 *et seq.*[5] However, plaintiffs' arguments fail for the same reason their argument under CWA and CERCLA failed: the United States and the state of Alaska, acting as government trustees, have already recovered for the very same damages plaintiffs now seek here. The Consent Decree expressly released Exxon from "any and all civil claims" that the governments brought or could have brought against Exxon under TAPAA or state law. Consent Decree, ¶¶ 6(d), 13. Thus, under the doctrine of *res judicata,* plaintiffs are barred from asserting such claims in a second suit.[6]

### IV.

The governments of Alaska and the United States have already recovered damages on behalf of the public for the public's loss of use and enjoyment of natural resources caused by the tragic *Exxon Valdez* oil spill in Prince William Sound. Because plaintiffs were in privity with these governments, as members of the public, and because plaintiffs seek to recover for the very same damages the governments have recovered for, plaintiffs' claims are barred by *res judicata.* For these reasons, the district court judgment is

AFFIRMED.

---

5. TAPAA provides a cause of action against the owner or operator of a vessel and the Trans–Alaska Liability Fund, a fund administered by the holders of the trans-Alaska pipeline right-of-way, for spills of oil related to the pipeline. The law makes these parties strictly liable for "all damages ... sustained by any person." 43 U.S.C. § 1653(c). Damages include loss of use of natural resources. 43 C.F.R. § 29.1(e)(5) (1992). The Alaska strict liability statute covering hazardous substances includes a similar damage provision. Alaska Stat. § 46.03.824–26.

6. The proposition that individuals cannot recover damages for harm not distinct from the harm suffered by the public at large is consistent with the legislative history behind CERCLA. *See* 126 Cong.Rec. 27,084 (Sept. 24, 1980); *Ohio,* 880 F.2d at 451 (noting that Congress eliminated from the final version of CERCLA provisions that would have allowed claims by private parties to recover public lost-use values).