Filed 1/14/22 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| In re RUDY TERRAZAS, | E077170 |
| On Habeas Corpus. | (Super.Ct.No. FELSB21000038) |
| | ORDER MODIFYING OPINION |
| | [NO CHANGE IN JUDGMENT] |

THE COURT

The opinion filed in this matter on January 11, 2022 is modified as follows:

Petitioner's name, as reflected in the case title and throughout the opinion, is changed from Rudy Terraza to Rudy Terrazas.[1]

Except for this modification the opinion remains unchanged. This modification does not effect a change in judgment.

RAPHAEL
                                                                                                            J.

We concur:

McKINSTER
            Acting P. J.
MILLER
                        J.

---

[1] Petitioner captioned his petition using the name Rudy Terraza, but counsel has confirmed Terrazas is the correct spelling.

1

MAILING LIST FOR CASE: E077170

In re Rudy Terraza on Habeas Corpus

Superior Court Clerk
San Bernardino County
8303 N. Haven Ave
Rancho Cucamonga, CA 91730

Edward J. O'Brien
San Bernardino County Public Defender
412 Hospitality Lane, #3
San Bernardino, CA 92415

John Paul Walters
Office of the Attorney General
P. O. Box 85266
San Diego, CA 92186-5266

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| In re RUDY TERRAZA,<br><br>On Habeas Corpus. | E077170<br><br>(Super.Ct.No. FELSB21000038)<br><br>OPINION |

ORIGINAL PROCEEDINGS; petition for writ of habeas corpus. Charles J. Umeda, Judge. Petition granted.

Thomas W. Sone, San Bernardino County Public Defender, Edward J. O'Brien, Deputy Public Defender for Petitioner.

Rob Bonta, Attorney General, Phillip J. Lindsay, Assistant Attorney General, Amanda J. Murray and John P. Walters, Deputy Attorneys General, for Respondent.

A prison warden sought to perform electroconvulsive therapy (ECT) on an inmate, whom the trial court found lacked capacity to consent to the treatment. ECT involves electric shocks applied to the brain to produce a seizure while the patient is under anesthesia. The trial court authorized ECT after making several findings required by the Penal Code, including that ECT would be beneficial and that there was a compelling justification for it.

1

In this habeas proceeding, where we have stayed the therapy, the inmate argues that the state constitutional right to privacy required the appointment of a surrogate to make a consent determination for him, beyond trial court findings of ECT's suitability. Upon consideration of precedent, we conclude that the state constitutional right to refuse medical treatment does not require appointment of a surrogate decisionmaker. Nevertheless, we conclude that a court's authorization of ECT therapy must include a consideration of whether the inmate, when he or she was competent, expressed any preferences, views, or beliefs that would operate to preclude consent to the procedure. By statute, such consideration is required for most medical procedures performed on incarcerated persons lacking capacity to consent. Because the statutory balancing test for ECT does not do so, we grant the writ to allow further consideration.

BACKGROUND

This case began on April 13, 2021, when the Acting Warden of the California Institute for Men petitioned the Superior Court for authorization to perform ECT on inmate Rudy Paul Terraza. The warden's petition relied on a statutory scheme enacted in 1974 that has never been addressed by an appellate court: Penal Code sections 2670 through 2680, which govern "organic therapy" in prisons.[2] The statute defines organic therapy as encompassing, among other things, "[s]hock therapy, including, but not limited to, any convulsive therapy" as well as any "electronic stimulation of the brain." (§ 2670.5, subds. (c)(2), (c)(3).)

---

[2] Undesignated statutory references are to the Penal Code.

2

Penal Code section 2670, a declaration of policy, establishes that in California "all persons, including all persons involuntarily confined, have a fundamental right against enforced interference with their thought processes, states of mind, and patterns of mentation, through the use of organic therapies."  The declaration states that organic therapies shall not be performed on involuntarily confined persons who lack "the capacity for informed consent," unless the state establishes that the therapy "would be beneficial to the person, that there is a compelling interest in administering such therapy, and that there are no less onerous alternatives to such therapy."  (*Ibid*.)  Other provisions address matters relating to informed consent (§§ 2670.5-2674), the process of a warden's petition to the superior court (§§ 2675-2678), and the court's determination of the petition (§ 2679).

The facts of this case are not disputed in any material way.  Convicted of first-degree murder at age 17, Terraza is a 44-year-old with a history of mental illness.  According to a prison psychiatrist, Terraza has a "schizoaffective disorder, bipolar type . . . characterized by auditory hallucinations, delusions, and impairment in thought processing, volition and motivation, and social functioning, as well as significant mood swings, depression, and mania."  Despite medication and psychiatric treatment, his mental health had grown worse over time, and he had resided in a psychiatric hospital since September 2019.  He had been "consumed" by voices, with no desire to socialize or "practice self-care."  He interacted with auditory hallucinations and communicated with

deceased relatives. He occupied a single hospital room and would be unable to function in standard prison housing.

The psychiatrist averred that ECT was the "gold standard" treatment for patients like Terraza, and she asserted that it was "safe and effective." She described the procedure as involving electricity "applied to the scalp to produce a seizure, with an average duration of about 30 seconds. The seizures help the brain return to normal functioning." She described the procedure as painless because the patient is under general anesthesia, and she described possible side effects. Her opinion was that the treatment was in Terraza's best interest, necessary, and offered an "excellent" prognosis.

Following the petition, the trial court held a hearing where Terraza and the psychiatrist testified. Terraza's counsel argued that Terraza was not capable of providing informed consent, and disputed whether ECT would be beneficial. Thereafter, the court found that the People had not met their burden under section 2679, subdivision (a), to show that Terraza has the capacity to provide informed consent to ECT. Nevertheless, the court made findings required by section 2679, subdivision (b), that allow ECT when a prison inmate lacks such capacity. That is, the court found that the People had proven by clear and convincing evidence that there is a compelling interest justifying the use of ECT on Terraza; that there are no less onerous alternatives to ECT for him; and that ECT is a sound medical and psychiatric practice. Thus, the court authorized ECT for up to six months.

Terraza then filed this petition for a writ of habeas corpus and asked us to stay his ECT pending the disposition of the opinion. We granted the stay.

DISCUSSION

In this petition for a writ of habeas corpus, Terraza does not challenge the findings made by the trial court. Rather, he brings a claim under the right to privacy guaranteed by article I, section 1 of the California Constitution. He argues for "the appointment of a surrogate decision maker to determine if [ECT] is medically necessary and consistent with [Terraza's] expressed wishes or best interest." We hold that the constitutional right does not require the appointment of a surrogate decisionmaker for an incompetent prison inmate, but it does require the state to consider any wishes relating to medical treatment expressed by the inmate when previously competent.

Californians have a constitutional privacy right that protects against receiving unwanted medical treatment. Our Supreme Court has stated that "a competent adult has the right to refuse medical treatment, even treatment necessary to sustain life.' [Citations.] This right is grounded both in state constitutional and common law. [Citation.] The right of privacy guaranteed by the California Constitution, article I, section 1 'guarantees to the individual the freedom to choose to reject, or refuse to consent to, intrusions of his bodily integrity.'" (*In re Qawi* (2004) 32 Cal.4th 1, 14 (*Qawi*).) This dimension of the privacy right reflects a "fundamental interest in personal autonomy." (*Conservatorship of Wendland* (2001) 26 Cal.4th 519, 532.) That interest

means "that incompetent persons have a right, based in the California Constitution, to appropriate medical decisions that reflect their *own* interests and values." (*Id*. at p. 537.)

The privacy protection certainly protects against unwanted ECT, a procedure that involves inducing seizures by administering electric shocks through electrodes connected to the head. (Compare *Qawi*, *supra*, 32 Cal.4th at p. 14 [right to refuse medical treatment "clearly extends to the right to refuse antipsychotic drugs"] with *Love v. State Dept. of Education* (2018) 29 Cal.App.5th 980, 993-994 [as to compulsory immunization, right to privacy readily gives way to state's interest in protecting citizens' health and safety].) The question before us is whether the "organic therapy" statutes (§§ 2670-2680) adequately protect the constitutional privacy right that incompetent prison inmates and other "confined persons" have.

The individual right to refuse medical treatment is limited in certain circumstances by "countervailing state interests." (*Qawi*, *supra*, 32 Cal.4th at p. 15.) Our Supreme Court has stated that "[o]ne such interest is *parens patriae*, the state's interest 'in providing care to its citizens who are unable . . . to care for themselves.'[Citation.] In California, *parens patriae* may be used only to impose unwanted medical treatment on an adult when that adult has been adjudged incompetent." (*Id.* at pp. 15-16.)[3]

---

[3] The Latin term "*parens patriae*" literally means "parent of the country," and it traditionally has referred to the state's role as a guardian of those legally disabled. (*Alfred L. Snapp & Son, Inc. v. Puerto Rico* (1982) 458 U.S. 592, 600 & fn. 8.) *Qawi* spells the term without its penultimate letter, an "a." However, that spelling ("*parens patrie*") is not standard and is used in few places other than in *Qawi*. Even when we quote *Qawi*, we will spell the term the standard way. Our Supreme Court has spelled it

*[footnote continued on next page]*

The organic therapy statutes, through section 2679, govern the state's exercise of its *parens patriae* interest in providing care for involuntarily confined persons, including prison inmates, who "lack[] the capacity for informed consent." (§ 2679, subd. (b).) For such persons, section 2679 requires a judicial determination that the medical procedure would help the person, and that it is necessary and medically appropriate. Specifically, the court "shall determine by clear and convincing evidence that such therapy . . . would be beneficial; that there is a compelling interest justifying the use of the organic therapy upon the person; that there are no less onerous alternatives to such organic therapy; and that such organic therapy is in accordance with sound medical-psychiatric practice." (§ 2679, subd. (b).) The court made these findings here. Although the prison warden may have interests apart from benefitting the inmate (such as reducing hospital crowding), the trial court's section 2679 determination is based on the medical procedure's suitability for the inmate.

We see no authority suggesting that the state must appoint a third party to exercise its *parens patriae* power. The "prerogative of *parens patriae* is inherent in the supreme power of every state." (*Late Corporation of the Church of Jesus Christ of Latter-Day Saints v. United States* (1890) 136 U.S. 1, 57.) Thus, we reject Terraza's argument to the extent he asserts that the right to privacy encompasses the right to a surrogate decision maker to determine if ECT is "medically necessary" or consistent with his "best interest." Under the state constitution, an exercise of *parens patriae* authority may justify imposing

the standard way in several dozen other cases. (See, e.g., *Conservatorship of Wendland*, *supra*, 26 Cal.4th at p. 535 ["*parens patriae*"].)

invasive medical treatment on a prison inmate who has been adjudged incompetent, and the judicial determination provided by section 2679 is sufficient to ensure a determination on the necessity and value of ECT that is made for the inmate's benefit. A surrogate making the section 2679 findings would add nothing to vindicate Terraza's privacy interests.[4]

More persuasive is Terraza's request for a surrogate to ensure that the imposition of ECT is "consistent with [his] expressed wishes." Taken precisely, this request is not about whether ECT is likely to be beneficial as a medical matter—the state's *parens patriae* interest in caring for its citizens—but about whether subjecting Terraza to ECT accords with his own views expressed when competent. This reflects our Supreme Court's description of the right of one to ensure medical decisions based on one's "*own interests and values.*" (*Conservatorship of Wendland, supra,* 26 Cal.4th at p. 537.) It is thus reasonable to conclude that the state's *parens patriae* power to impose invasive medical treatment is subordinate to the patient's right to direct his medical treatment during incompetence, so long as the directions are made when the patient is competent.

---

[4] Where an inmate cannot afford to retain one, section 2677 allows for the appointment of an "independent medical expert . . . to examine the person's medical, mental, or emotional condition and to testify thereon." This is an important protection that can enable the inmate to dispute the basis for section 2679 findings where warranted. In this writ proceeding, the People argue that this court should grant the petition and issue a writ, but do so to appoint a section 2677 expert, rather than the surrogate decisionmaker that Terraza wants. Terraza, however, waives the appointment of an expert and goes so far as to insist that the People are wrong in arguing that the appointment cannot be waived. Terraza states that he is doing so because he is not disputing his condition. Section 2677 experts are appointed "on a person's behalf," so we conclude that an inmate may waive the appointment, as Terraza has done.

8

(See *id.* at p. 533-534 [right to refuse medical treatment "survives incapacity, in a practical sense, if exercised while competent pursuant to a law giving that act lasting validity," such as Health Care Decisions Law, which permits an advance directive about "'any aspect'" of health care].) That is, if a competent inmate refuses a medical procedure and then becomes incapacitated, the refusal may still preclude the state from the unrestrained imposition of the procedure that otherwise might occur under the *parens patriae* power.

For almost all medical treatments involving prison inmates in California, it is already the case that the inmate's wishes while competent are considered even if the inmate later lacks capacity. In 2015, the Legislature enacted Penal Code section 2604, which provides for appointing a surrogate for health care decisions involving an inmate patient who lacks capacity to give informed consent. (§ 2604, subd. (t)(1).) Where an inmate lacks capacity to consent, section 2604 requires the appointment of a "surrogate decisionmaker for health care for the inmate patient." (§ 2604, subd. (q)(1).) That surrogate "shall follow the inmate patient's personal values and other wishes to the extent those values and wishes are known." (§ 2604, subd. (q)(4).) The legislature, however, excluded ECT and a small number of other medical procedures from section 2604. (§ 2604, subd. (t)(2).)[5]

---

[5] In enacting the section 2604 surrogate appointment process for most inmate medical services, the Legislature intended to "speed[] up the process for obtaining the necessary authority to provide treatment services in cases where the inmate lacks decision making capability." (Sen. Rules Comm., Bill Analysis of Assem. Bill No. 1423 (2015-2016 Reg. Sess.) as amended April 20, 2015, p. 8.) The Legislature may have excluded

*[footnote continued on next page]*

9

Terraza in essence seeks the section 2604 surrogate here, though the Legislature excluded ECT from the provision's application. We do not think that the surrogate decisionmaker procedure in section 2604 is constitutionally required. Nevertheless, we conclude that the constitutional right to refuse medical treatment requires that the inmate's personal values and wishes, if known, be considered before the state imposes invasive medical treatment on an inmate who lacks the capacity to give informed consent. (See *Conservatorship of Wendland, supra,* 26 Cal.4th at p. 537.) In the context of the organic therapy statute, this means that, upon the request of the inmate's counsel, the trial court must determine whether the views that the inmate expressed while competent indicate that he or she would not consent to ECT while incapacitated.

Consideration of an inmate's personal values and wishes is not in the text of the organic therapy statutes, but it nevertheless is in harmony with the guarantee those statutes provide of uncensored communication with the inmate's parents, guardian or conservator about the proposed organic therapy (§ 2680, subd. (c)); those are individuals who may know of the inmate's expressed views when competent. It makes little sense for the statutory adjudication procedures to overlook the possibility of information from them about the inmate's personal views. It further is in harmony with section 2670's declaration of a "fundamental right" that no person with the capacity for informed consent who refuses ECT shall be compelled to undergo ECT. (See also *Conservatorship*

---

ECT from the process, along with other weighty medical procedures such as sterilization, because it had no wish to speed up the imposition of those services, not because it concluded that inmate consent to those services was unnecessary.

10

*of Wendland*, *supra*, 26 Cal.4th at p. 532 ["the privacy clause does protect the fundamental interest in personal autonomy"].)  Our holding simply provides effect to such a refusal once an inmate has become incapacitated, though the statute itself does not do so.  Where the personal autonomy protected by Article I, section 1 of our state constitution has been interpreted to provide a right to medical decisions that reflect a person's own interests and values, we cannot see a sound reason to wholly omit consideration of those interests and values when a court is considering the imposition of ECT.

One way of accounting for the expressed views of incompetent inmates might be the surrogate decisionmaker required by section 2604 for most medical decisions.  But as we have said, we do not think the constitution requires that method.  We leave to the trial court the decision on how to receive evidence (if any) of Terrazas's personal values and wishes.  Credible evidence that an inmate, when competent, expressed opposition to receiving an invasive medical procedure could preclude the imposition of that medical procedure on the inmate when later incapacitated.  If the inmate, when competent, has manifested personal views or values in opposition to ECT, it would take more than simply the court's section 2679 findings that ECT is suitable to overcome that lack of consent.  We need not, however, decide here what "legitimate penological interests"

might overcome a finding that an incapacitated inmate, when competent, expressed opposition to ECT.  (§ 2600, subd. (a).)[6]

Our record is silent on whether Terraza expressed any wishes while competent or, to similar effect, expressed any view relevant to whether he would refuse ECT. Accordingly, we grant the writ and direct the trial court to determine whether any such expressed wishes exist.

---

[6] In some cases, prison security could require involuntary medical treatment. "Another such countervailing state interest is in institutional security.  'It is . . .  well-established that when an individual is confined in a state institution, individual liberties must be balanced against the interests of the institution in preventing the individual from harming himself or others residing or working in the institution.' [Citation.]  Thus, even a competent prison inmate, for example, may be forcibly medicated, consistent with the federal due process clause, if it is determined that he is a danger to himself and others, and that the treatment is in his medical interest, as determined by an independent medical board. (*Washington v. Harper* (1990) 494 U.S. 210, 229.)" (*Qawi*, *supra*, 32 Cal.4th at p. 16; see also § 2671, subd. (a) [emergency use of shock treatments to alleviate imminent danger].)  It does not appear in our record that Terraza is a danger to himself or others, as the People have not asserted as much.

DISPOSITION

The writ of habeas corpus is GRANTED. The trial court is ordered to vacate its order imposing electroconvulsive therapy. The trial court is ordered to thereafter hold a hearing to determine whether Terraza, when competent, expressed views that indicate a lack of consent to the imposition of electroconvulsive therapy on him. If not, the court may again order electroconvulsive therapy. If so, the court may determine whether legitimate penological interests nevertheless require the therapy.

CERTIFIED FOR PUBLICATION

RAPHAEL_____
J.

We concur:

McKINSTER_____
    Acting P. J.

MILLER_____
            J.

13