Chief Justice Roberts,
with whom Justice Scalia, Justice Thomas, and Justice Alito join, dissenting.
Global warming may be a “crisis,” even “the most pressing environmental problem of our time.” Pet. for Cert. 26, 22. Indeed, it may ultimately affect nearly everyone on the planet in some potentially adverse way, and it may be that governments have done too little to address it. It is not a problem, however, that has escaped the attention of policymakers in the Executive and Legislative Branches of our Government, who continue to consider regulatory, legislative, and treaty-based means of addressing global climate change.
Apparently dissatisfied with the pace of progress on this issue in the elected branches, petitioners have come to the courts claiming broad-ranging injury, and attempting to tie that injury to the Government’s alleged failure to comply with a rather narrow statutory provision. I would reject these challenges as nonjusticiable. Such a conclusion involves no judgment on whether global warming exists, what causes it, or the extent of the problem. Nor does it render petitioners without recourse. This Court’s standing jurisprudence simply recognizes that redress of grievances of the sort at issue here “is the function of Congress and the Chief Executive,” not the federal courts. Lujan v. Defenders of Wildlife, 504 U. S. 555, 576 (1992). I would vacate the judg *536 ment below and remand for dismissal of the petitions for review.
I
Article III, § 2, of the Constitution limits the federal judicial power to the adjudication of “Cases” and “Controversies.” “If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so.” DaimlerChrysler Corp. v. Cuno, 547 U. S. 332, 341 (2006). “Standing to sue is part of the common understanding of what it takes to make a justiciable ease,” Steel Co. v. Citizens for Better Environment, 523 U. S. 83, 102 (1998), and has been described as “an essential and unchanging part of the case-or-controversy requirement of Article III,” Defenders of Wildlife, supra, at 560.
Our modern framework for addressing standing is familiar: “A plaintiff must allege personal injury fairly traceable to the defendant’s allegedly unlawful conduct and likely to be redressed by the requested relief.” DaimlerChrysler, supra, at 342 (quoting Allen v. Wright, 468 U. S. 737, 751 (1984); internal quotation marks omitted). Applying that standard here, petitioners bear the burden of alleging an injury that is fairly traceable to the Environmental Protection Agency’s failure to promulgate new motor vehicle greenhouse gas emission standards, and that is likely to be redressed by the prospective issuance of such standards.
Before determining whether petitioners can meet this familiar test, however, the Court changes the rules. It asserts that “States are not normal litigants for the purposes of invoking federal jurisdiction,” and that given “Massachusetts’ stake in protecting its quasi-sovereign interests, the Commonwealth is entitled to special solicitude in our standing analysis.” Ante, at 518, 520 (emphasis added).
Relaxing Article III standing requirements because asserted injuries are pressed by a State, however, has no basis in our jurisprudence, and support for any such “special solicitude” is conspicuously absent from the Court’s opinion. The general judicial review provision cited by the Court, 42 *537 U. S. C. § 7607(b)(1), affords States no special rights or status. The Court states that “Congress has ordered EPA to protect Massachusetts (among others)” through the statutory provision at issue, § 7521(a)(1), and that “Congress has ... recognized a concomitant procedural right to challenge the rejection of its rulemaking petition as arbitrary and capricious.” Ante, at 519, 520. The reader might think from this unfortunate phrasing that Congress said something about the rights of States in this particular provision of the statute. Congress knows how to do that when it wants to, see, e. g., § 7426(b) (affording States the right to petition EPA to directly regulate certain sources of pollution), but it has done nothing of the sort here. Under the law on which petitioners rely, Congress treated public and private litigants exactly the same.
Nor does the case law cited by the Court provide any support for the notion that Article III somehow implicitly treats public and private litigants differently. The Court has to go back a full century in an attempt to justify its novel standing rule, but even there it comes up short. The Court’s analysis hinges on Georgia v. Tennessee Copper Co., 206 U. S. 230 (1907) — a case that did indeed draw a distinction between a State and private litigants, but solely with respect to available remedies. The case had nothing to do with Article III standing.
In Tennessee Copper, the State of Georgia sought to enjoin copper companies in neighboring Tennessee from discharging pollutants that were inflicting “a wholesale destruction of forests, orchards and crops” in bordering Georgia counties. Id., at 236. Although the State owned very little of the territory allegedly affected, the Court reasoned that Georgia— in its capacity as a “quasi-sovereign” — “has an interest independent of and behind the titles of its citizens, in all the earth and air within its domain.” Id., at 237. The Court explained that while “[t]he very elements that would be relied upon in a suit between fellow-citizens as a ground for equitable relief [were] wanting,” a State “is not lightly to be re *538 quired to give up quasi-sovereign rights for pay.” Ibid. Thus while a complaining private litigant would have to make do with a legal remedy — one “for pay” — the State was entitled to equitable relief. See id., at 237-238.
In contrast to the present case, there was no question in Tennessee Copper about Article III injury. See id., at 238-239. There was certainly no suggestion that the State could show standing where the private parties could not; there was no dispute, after all, that the private landowners had “an action at law.” Id., at 238. Tennessee Copper has since stood for nothing more than a State’s right, in an original jurisdiction action, to sue in a representative capacity as parens patriae. See, e. g., Maryland v. Louisiana, 451 U. S. 725, 737 (1981). Nothing about a State’s ability to sue in that capacity dilutes the bedrock requirement of showing injury, causation, and redressability to satisfy Article III.
A claim of parens patriae standing is distinct from an allegation of direct injury. See Wyoming v. Oklahoma, 502 U. S. 437, 448-449, 451 (1992). Far from being a substitute for Article III injury, parens patriae actions raise an additional hurdle for a state litigant: the articulation of a “quasi-sovereign interest” “apart from the interests of particular private parties.” Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez, 458 U. S. 592, 607 (1982) (emphasis added) (cited ante, at 519). Just as an association suing on behalf of its members must show not only that it represents the members but that at least one satisfies Article III requirements, so too a State asserting quasi-sovereign interests as parens patriae must still show that its citizens satisfy Article III Focusing on Massachusetts’s interests as quasi-sovereign makes the required showing here harder, not easier. The Court, in effect, takes what has always been regarded as a necessary condition for parens patriae standing — a quasi-sovereign interest — and converts it into a sufficient showing for purposes of Article III.
*539 What is more, the Court’s reasoning falters on its own terms. The Court asserts that Massachusetts is entitled to “special solicitude” due to its “quasi-sovereign interests,” ante, at 520, but then applies our Article III standing test to the asserted injury of the Commonwealth’s loss of coastal property. See ante, at 522 (concluding that Massachusetts “has alleged a particularized injury in its capacity as a landowner” (emphasis added)). In the context of parens patriae standing, however, we have characterized state ownership of land as a “nonsovereign interes[tj” because a State “is likely to have the same interests as other similarly situated proprietors.” Alfred L. Snapp & Son, supra, at 601.
On top of everything else, the Court overlooks the fact that our cases cast significant doubt on a State’s standing to assert a quasi-sovereign interest — as opposed to a direct injury — against the Federal Government. As a general rule, we have held that while a State might assert a quasi-sovereign right as parens patriae “for the protection of its citizens, it is no part of its duty or power to enforce their rights in respect of their relations with the Federal Government. In that field it is the United States, and not the State, which represents them.” Massachusetts v. Mellon, 262 U. S. 447, 485-486 (1923) (citation omitted); see also Alfred L. Snapp & Son, supra, at 610, n. 16.
All of this presumably explains why petitioners never cited Tennessee Copper in their briefs before this Court or the D. C. Circuit. It presumably explains why not one of the legion of amici supporting petitioners ever cited the case. And it presumably explains why not one of the three judges writing below ever cited the case either. Given that one purpose of the standing requirement is “ ‘to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination,’ ” ante, at 517 (quoting Baker v. Carr, 369 U. S. 186, 204 (1962)), it is ironic that the Court today adopts a new theory *540 of Article III standing for States without the benefit of briefing or argument on the point.[1]
II
It is not at all clear how the Court’s “special solicitude” for Massachusetts plays out in the standing analysis, except as an implicit concession that petitioners cannot establish standing on traditional terms. But the status of Massachusetts as a State cannot compensate for petitioners’ failure to demonstrate injury in fact, causation, and redressability.
When the Court actually applies the three-part test, it focuses, as did the dissent below, see 415 F. 3d 50, 64 (CADC 2005) (opinion of Tatel, J.), on the Commonwealth’s asserted loss of coastal land as the injury in fact. If petitioners rely on loss of land as the Article III injury, however, they must ground the rest of the standing analysis in that specific injury. That alleged injury must be “concrete and particularized,” Defenders of Wildlife, 504 U. S., at 560, and “distinct and palpable,” Alien, 468 U. S., at 751 (internal quotation marks omitted). Central to this concept of “particularized” injury is the requirement that a plaintiff be affected in a “personal and individual way,” Defenders of Wildlife, 504 *541 U. S., at 560, n. 1, and seek relief that “directly and tangibly benefits him” in a manner distinct from its impact on “the public at large,” id., at 573-574. Without “particularized injury, there can be no confidence of ‘a real need to exercise the power of judicial review’ or that relief can be framed ‘no broader than required by the precise facts to which the court’s ruling would be applied.’ ” Warth v. Seldin, 422 U. S. 490, 508 (1975) (quoting Schlesinger v. Reservists Comm. to Stop the War, 418 U. S. 208, 221-222 (1974)).
The very concept of global warming seems inconsistent with this particularization requirement. Global warming is a phenomenon “harmful to humanity at large,” 415 F. 3d, at 60 (Sentelle, J., dissenting in part and concurring in judgment), and the redress petitioners seek is focused no more on them than on the public generally — it is literally to change the atmosphere around the world.
If petitioners’ particularized injury is loss of coastal land, it is also that injury that must be “actual or imminent, not conjectural or hypothetical,” Defenders of Wildlife, supra, at 560 (internal quotation marks omitted), “real and immediate,” Los Angeles v. Lyons, 461 U. S. 95, 102 (1983) (internal quotation marks omitted), and “certainly impending,” Whitmore v. Arkansas, 495 U. S. 149, 158 (1990) (internal quotation marks omitted).
As to “actual” injury, the Court observes that “global sea levels rose somewhere between 10 and 20 centimeters over the 20th century as a result of global warming” and that “[t]hese rising seas have already begun to swallow Massachusetts’ coastal land.” Ante, at 522. But none of petitioners’ declarations supports that connection. One declaration states that “a rise in sea level due to climate change is occurring on the coast of Massachusetts, in the metropolitan Boston area,” but there is no elaboration. 2 Petitioners’ Standing Appendix in No. 03-1361, etc. (CADC), p. 196 (Stdg. App.). And the declarant goes on to identify a “significan[t]” wow-global-warming cause of Boston’s rising sea level: land *542 subsidence. Id., at 197; see also id., at 216. Thus, aside from a single conclusory statement, there is nothing in petitioners’ 43 standing declarations and accompanying exhibits to support an inference of actual loss of Massachusetts coastal land from 20th-century global sea level increases. It is pure conjecture.
The Court’s attempts to identify “imminent” or “certainly impending” loss of Massachusetts coastal land fares no better. See ante, at 522-523. One of petitioners’ declarants predicts global warming will cause sea level to rise by 20 to 70 centimeters by the year 2100. Stdg. App. 216. Another uses a computer modeling program to map the Commonwealth’s coastal land and its current elevation, and calculates that the high-end estimate of sea level rise would result in the loss of significant state-owned coastal land. Id., at 179. But the computer modeling program has a conceded average error of about 30 centimeters and a maximum observed error of 70 centimeters. Id., at 177-178. As an initial matter, if it is possible that the model underrepresents the elevation of coastal land to an extent equal to or in excess of the projected sea level rise, it is difficult to put much stock in the predicted loss of land. But even placing that problem to the side, accepting a century-long time horizon and a series of compounded estimates renders requirements of imminence and immediacy utterly toothless. See Defenders of Wildlife, supra, at 565, n. 2 (while the concept of “ ‘imminence’ ” in standing doctrine is “somewhat elastic,” it can be “stretched beyond the breaking point”). “Allegations of possible future injury do not satisfy the requirements of Art. III. A threatened injury must be certainly impending to constitute injury in fact.” Whitmore, supra, at 158 (internal quotation marks omitted; emphasis added).
III
Petitioners’ reliance on Massachusetts’s loss of coastal land as their injury in fact for standing purposes creates insur *543 mountable problems for them with respect to causation and redressability. To establish standing, petitioners must show a causal connection between that specific injury and the lack of new motor vehicle greenhouse gas emission standards, and that the promulgation of such standards would likely redress that injury. As is often the case, the questions of causation and redressability overlap. See Allen, 468 U. S., at 758, n. 19 (observing that the two requirements were “initially articulated by this Court as two facets of a single causation requirement” (internal quotation marks omitted)). And importantly, when a party is challenging the Government’s allegedly unlawful regulation, or lack of regulation, of a third party, satisfying the causation and redressability requirements becomes “substantially more difficult.” Defenders of Wildlife, 504 U. S., at 562 (internal quotation marks omitted); see also Warth, swpra, at 504-505.
Petitioners view the relationship between their injuries and EPA’s failure to promulgate new motor vehicle greenhouse gas emission standards as simple and direct: Domestic motor vehicles emit carbon dioxide and other greenhouse gases. Worldwide emissions of greenhouse gases contribute to global warming and therefore also to petitioners’ alleged injuries. Without the new vehicle standards, greenhouse gas emissions — and therefore global warming and its attendant harms — have been higher than they otherwise would have been; once EPA changes course, the trend will be reversed.
The Court ignores the complexities of global warming, and does so by now disregarding the “particularized” injury it relied on in step one, and using the dire nature of global warming itself as a bootstrap for finding causation and redressability. First, it is important to recognize the extent of the emissions at issue here. Because local greenhouse gas emissions disperse throughout the atmosphere and remain there for anywhere from 50 to 200 years, it is global emissions data that are relevant. See App. to Pet. for Cert. *544 A-73. According to one of petitioners’ declarations, domestic motor vehicles contribute about 6 percent of global carbon dioxide emissions and 4 percent of global greenhouse gas emissions. Stdg. App. 232. The amount of global emissions at issue here is smaller still; § 202(a)(1) of the Clean Air Act covers only new motor vehicles and new motor vehicle engines, so petitioners’ desired emission standards might reduce only a fraction of 4 percent of global emissions.
This gets us only to the relevant greenhouse gas emissions; linking them to global warming and ultimately to petitioners’ alleged injuries next requires consideration of further complexities. As EPA explained in its denial of petitioners’ request for rulemaking,
“predicting future climate change necessarily involves a complex web of economic and physical factors including: our ability to predict future global anthropogenic emissions of [greenhouse gases] and aerosols; the fate of these emissions once they enter the atmosphere (e. g., what percentage are absorbed by vegetation or are taken up by the oceans); the impact of those emissions that remain in the atmosphere on the radiative properties of the atmosphere; changes in critically important climate feedbacks (e. g., changes in cloud cover and ocean circulation); changes in temperature characteristics (e. g., average temperatures, shifts in daytime and evening temperatures); changes in other climatic parameters (e. g., shifts in precipitation, storms); and ultimately the impact of such changes on human health and welfare (e. g., increases or decreases in agricultural productivity, human health impacts).” App. to Pet. for Cert. A-83 through A-84.
Petitioners are never able to trace their alleged injuries back through this complex web to the fractional amount of global emissions that might have been limited with EPA standards. In light of the bit-part domestic new motor vehi *545 cle greenhouse gas emissions have played in what petitioners describe as a 150-year global phenomenon, and the myriad additional factors bearing on petitioners’ alleged injury — the loss of Massachusetts coastal land — the connection is far too speculative to establish causation.
IV
Redressability is even more problematic. To the tenuous link between petitioners’ alleged injury and the indeterminate fractional domestic emissions at issue here, add the fact that petitioners cannot meaningfully predict what will come of the 80 percent of global greenhouse gas emissions that originate outside the United States. As the Court acknowledges, “developing countries such as China and India are poised to increase greenhouse gas emissions substantially over the next century,” ante, at 525-526, so the domestic emissions at issue here may become an increasingly marginal portion of global emissions, and any decreases produced by petitioners’ desired standards are likely to be overwhelmed many times over by emissions increases elsewhere in the world.
Petitioners offer declarations attempting to address this uncertainty, contending that “[i]f the U. S. takes steps to reduce motor vehicle emissions, other countries are very likely to take similar actions regarding their own motor vehicles using technology developed in response.to the U. S. program.” Stdg. App. 220; see also id., at 311-312. In other words, do not worry that other countries will contribute far more to global warming than will U. S. automobile emissions; someone is bound to invent something, and places like the People’s Republic of China or India will surely require use of the new technology, regardless of cost. The Court previously has explained that when the existence of an element of standing “depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume *546 either to control or to predict,” a party must present facts supporting an assertion that the actor will proceed in such a manner. Defenders of Wildlife, 504 U. S., at 562 (quoting ASARCO Inc. v. Kadish, 490 U. S. 605, 615 (1989) (opinion of Kennedy, J.); internal quotation marks omitted). The declarations’ conclusory (not to say fanciful) statements do not even come close.
No matter, the Court reasons, because any decrease in domestic emissions will “slow the pace of global emissions increases, no matter what happens elsewhere.” Ante, at 526. Every little bit helps, so Massachusetts can sue over any little bit.
The Court’s sleight of hand is in failing to link up the different elements of the three-part standing test. What must be likely to be redressed is the particular injury in fact. The injury the Court looks to is the asserted loss of land. The Court contends that regulating domestic motor vehicle emissions will reduce carbon dioxide in the atmosphere, and therefore redress Massachusetts’s injury. But even if regulation does reduce emissions — to some indeterminate degree, given events elsewhere in the world — the Court never explains why that makes it likely that the injury in fact — the loss of land — will be redressed. Schoolchildren know that a kingdom might be lost “all for the want of a horseshoe nail,” but “likely” redressability is a different matter. The realities make it pure conjecture to suppose that EPA regulation of new automobile emissions will likely prevent the loss of Massachusetts coastal land.
V
Petitioners’ difficulty in demonstrating causation and redressability is not surprising given the evident mismatch between the source of their alleged injury — catastrophic global warming — and the narrow subject matter of the Clean Air Act provision at issue in this suit. The mismatch suggests *547 that petitioners’ true goal for this litigation may be more symbolic than anything else. The constitutional role of the courts, however, is to decide concrete cases — not to serve as a convenient forum for policy debates. See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U. S. 464, 472 (1982) (“[Standing] tends to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action”).
When dealing with legal doctrine phrased in terms of what is “fairly” traceable or “likely” to be redressed, it is perhaps not surprising that the matter is subject to some debate. But in considering how loosely or rigorously to define those adverbs, it is vital to keep in mind the purpose of the inquiry. The limitation of the judicial power to cases and controversies “is crucial in maintaining the tripartite allocation of power set forth in the Constitution.” DaimlerChrysler, 547 U. S., at 341 (internal quotation marks omitted). In my view, the Court today — addressing Article Ill’s “core component of standing,” Defenders of Wildlife, supra, at 560 — fails to take this limitation seriously.
To be fair, it is not the first time the Court has done so. Today’s decision recalls the previous high-water mark of diluted standing requirements, United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U. S. 669 (1973). SCRAP involved “[p]robably the most attenuated injury conferring Art. Ill standing” and “surely went to the very outer limit of the law” — until today. Whitmore, 495 U. S., at 158-159; see also Lujan v. National Wildlife Federation, 497 U. S. 871, 889 (1990) (SCRAP “has never since been emulated by this Court”). In SCRAP, the Court based an environmental group’s standing to challenge a railroad freight rate surcharge on the group’s allegation that *548 increases in railroad rates would cause an increase in the use of nonrecyclable goods, resulting in the increased need for natural resources to produce such goods. According to the group, some of these resources might be taken from the Washington area, resulting in increased refuse that might find its way into area parks, harming the group’s members. 412 U. S., at 688.
Over time, SCRAP became emblematic not of the looseness of Article III standing requirements, but of how utterly manipulable they are if not taken seriously as a matter of judicial self-restraint. SCRAP made standing seem a lawyer’s game, rather than a fundamental limitation ensuring that courts function as courts and not intrude on the politically accountable branches. Today’s decision is SCRAP for a new generation.[2]
Perhaps the Court recognizes as much. How else to explain its need to devise a new doctrine of state standing to support its result? The good news is that the Court's “special solicitude” for Massachusetts limits the future applicability of the diluted standing requirements applied in this case. The bad news is that the Court’s self-professed relaxation of those Article III requirements has caused us to transgress “the proper — and properly limited — role of the courts in a *549 democratic society.” Allen, 468 U. S., at 750 (internal quotation marks omitted).
I respectfully dissent.

 The Court seems to think we do not recognize that Tennessee Copper is a case about parens patriae standing, ante, at 520-521, n. 17, but we have no doubt about that. The point is that nothing in our cases (or Hart & Wechsler) suggests that the prudential requirements for parens patriae standing, see Republic of Venezuela v. Philip Morris Inc., 287 F. 3d 192,199, n. (CADC 2002) (observing that “parens patriae is merely a species of prudential standing” (internal quotation marks omitted)), can somehow substitute for, or alter the content of, the “irreducible constitutional minimum” requirements of injury in fact, causation, and redressability under Article III. Lujan v. Defenders of Wildlife, 504 U. S. 555, 560 (1992).
Georgia v. Pennsylvania R. Co., 324 U. S. 439 (1945), is not to the contrary. As the caption makes clear enough, the fact that a State may assert rights under a federal statute as parens patriae in no way refutes our clear ruling that “[a] State does not have standing as parens patriae to bring an action against the Federal Government.” Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez, 458 U. S. 592, 610, n. 16 (1982).

 The difficulty with SCRAP, and the reason it has not been followed, is not the portion cited by the Court. See ante, at 526-527, n. 24. Rather, it is the attenuated nature of the injury there, and here, that is so troubling. Even in SCRAP, the Court noted that what was required was “something more than an ingenious academic exercise in the conceivable,” 412 U. S., at 688, and we have since understood the allegation there to have been “that the string of occurrences alleged would happen immediately,” Whitmore v. Arkansas, 495 U. S. 149, 159 (1990) (emphasis added). That is hardly the case here.
The Court says it is “quite wrong” to compare petitioners’ challenging “EPA’s parsimonious construction of the Clean Air Act to a mere ‘lawyer’s game.’” Ante, at 527, n. 24. Of course it is not the legal challenge that is merely “an ingenious academic exercise in the conceivable,” SCRAP, supra, at 688, but the assertions made in support of standing.