# IN THE SUPERIOR COURT OF THE VIRGIN ISLANDS

## DIVISION OF ST. CROIX

GOVERNMENT OF THE VIRGIN
ISLANDS by and through JUSTA
ENCARNACION, Commissioner of Health,
and ARIEL SMITH, Attorney General, and
THE VIRGIN ISLANDS HOSPITALS AND
HEALTH FACILITIES CORPORATION,

　　　　　Plaintiffs,

v.

HEALTH QUEST, LLC d/b/a CARIBBEAN
KIDNEY CENTER and WALTER
GARDINER, MD.,

　　　　　Defendants.

SX-2023-CV-00354

ACTION FOR: BREACH OF CONTRACT
AND INJUCTIVE RELIEF

**Appearances:**

**CHRISTOPHER TIMMONS, JR., ESQ.**
Virgin Islands Department of Justice
Kingshill, VI 00850
*For Plaintiffs*

**SCOT MCCHAIN, ESQ.**
McChain Hamm & Associates
Christiansted, VI 00820
*For Defendants*

Cite as 2023 VI Super 63U

## MEMORANDUM OPINION AND ORDER

¶1　　**THIS MATTER** is before the Court on a Motion for Temporary Restraining Order and Preliminary Injunction filed October 6, 2023. The accompanying Verified Complaint ("Complaint") for Preliminary and Permanent Injunction alleges two counts of anticipatory breach of contract based upon contractual and statutory rights and obligations of the Parties relative to providing outpatient renal dialysis services to patients of the Virgin Islands.

¶2　　On October 7, 2023, the Court issued an emergency Temporary Restraining Order (TRO) enjoining the Defendants from terminating their end-stage renal dialysis ("ESRD") services at 5:00 p.m. on October 7, 2023. The Court also scheduled the matter for an evidentiary hearing on October 16, 2023. At the conclusion of the hearing, the Court ruled from the bench and issued a Preliminary Injunction effective for ninety days (three months) based upon the findings that the

*Government of the Virgin Islands, et al. v. Health Quest, LLC., et al.*
Case No. SX-2023-CV-00354
MEMORANDUM OPINION and ORDER
Page 2 of 16

Cite as 2023 VI Super 63U

Government had meritorious claims, irreparable harm would be suffered by the Government as *parens patriae*, were status quo not maintained, and the public interest and irreparable harm outweighed the minimal harm to the Defendants. This Memorandum Opinion follows the Court's ruling.

## Factual Background

¶3    Health Quest, LLC d/b/a Caribbean Kidney Center ("CKC") and Dr. Walter Gardiner[1] (jointly referred to as "Defendants") have been operating renal dialysis facilities in the Virgin Islands for twenty-one years in St. Croix and nine years in St. Thomas. In addition to providing services to privately insured clients, Defendants also provide services to clients whose health care services are insured by Medicare and Medicaid. As a condition of operating in the Virgin Islands, dialysis facilities are required to comply with rules and procedures administered by the Centers for Medicaid and Medicare Services (CMS).

¶4    During his testimony, Dr. Gardiner explained that throughout the period of operation, CKC faced staffing challenges which were sometimes resolved by contracting with travel nurse services or by utilizing the services of Pafford Medical Service ("Pafford")[2] to meet CMS staffing requirements. These staffing methods led to increased costs in addition to the increased costs of supplies.[3] However, as Dr. Gardiner testified, CKC managed to continue to provide its renal dialysis services to its patients, which now total 120, over the years. He further testified that in 2020, when faced with Covid19 challenges, Defendants applied for and received a Covid19 federal grant to pay for staff trained in dialysis services, who had to be recruited from the mainland mainly as travel nurses at much higher rates. This was corroborated by Commissioner Encarnacion. Both Dr. Gardiner and Commissioner Encarnacion testified that in May 2023, the Covid19 grant ended, and upon Dr. Gardiner's request, on June 7, 2023, the Legislature of the Virgin Islands granted $700,000 to Defendants to cover costs to recruit and retain dialysis-trained clinical staff required by CMS rules and regulations to avert a closure of the CKC facilities.[4] Dr. Gardiner testified that he managed the grant so well that he extended the use of the funds beyond August 2023, the period of its intended use, to October 5, 2023. Dr. Gardiner notified Commissioner Encarnacion and CMS on October 3,2023 that the funds would expire on October 5, 2023.[5] For that reason, Dr. Gardiner stated that he made the decision for CKC to discontinue providing services and cease operations as of October 7, 2023.

¶5    A little more than two years earlier, on July 21, 2021, Virgin Islands Hospitals and Health Facilities Corporation ("VIHHFC") and the Defendants entered into an Outsourcing Contract ("the Contract"). The general purpose of the contract was to establish an arrangement in which

---

[1] Dr. Gardiner testified that he is the owner and operator of CKC.

[2] Hearing Testimony of Dr. Gardiner.

[3] Hearing Testimony of Dr. Gardiner.

[4] See also, Hearing Exhibit 1, Letter addressed to Ray Fonseca, Chairman of the Committee of (sic) the Health, Hospitals and Human Services, which states, "On June 7, 2023, in testimony to the Committee of Health, Hospitals and Human Services of the 35th Legislature of the Virgin Islands, principals of the Caribbean Kidney Center (CKC) informed the Committee that due to the ongoing national shortage of dialysis-trained clinical staff and the spiraling costs of recruiting and retaining staff from the mainland, CKC was forced to consider closing. The Senate responded quickly and prudently with legislation appropriating funds to supplement CKC staffing temporarily..."

[5] Hearing Testimony of Dr. Gardiner.

Defendants would provide renal dialysis services to "the present outpatients of the Governor Juan F. Luis Hospital and Medical Center" ("JFLH"). JFLH was considering closing its outpatient ESRD hemodialysis unit, and all patients referred by physicians on its medical staff and in accordance with CKC's patient eligibility criteria were to be transferred to CKC's dialysis facility located at 5134 Sundial Park, Christiansted, U.S. Virgin Islands 00820."[6] The Contract also provides that (1) the transfer of the patients to Defendants required each patient's consent to the transfer of their medical records to CKC;[7] (2) JFLH is responsible to obtain the signed consent from each ESRD patient as part of the transition;[8] and (3) formal meetings with the parties to the contract and each patient would be held to monitor and manage the transfer of said patient.[9] Commissioner Encarnacion and Mr. Christopher Finch, Chair of VIHHFC, testified that the patients each refused to give their consent to the transfer of their medical records. Hence, no ESRD patient transfers has occurred to date.[10] Dr. Gardiner, however, testified that he incurred costs to have his facilities ready to accept the transfers after the signing of the Contract. Specifically, he states that he recruited additional staff, dialysis-trained clinical nurses, and technicians, expanded his facilities, and purchased equipment and furniture. Despite not receiving the expected number of patients, Dr. Gardiner maintains that CKC was nonetheless forced to maintain additional staff in anticipation of JFLH's eventual transition of its ESRD patients to CKC's care. The Outsourcing Contract, however, states that CKC is solely responsible for adequate staffing, furnishing and facilities and supplies.[11]

¶6     Performance of the Contract did not materialize as the parties anticipated because the patients did not consent to the transfer. Dr. Gardiner contends that this failure added to the risk of depleting his operational resources. In anticipation of the exhaustion of financing options for the overhead costs of operation of the facilities, the parties engaged in active discussions and negotiations for the sale and purchase of both of Defendant's facilities in St. Croix and St. Thomas.[12] Appraisals were solicited but not received until late September 2023. Mr. Finch testified that after its receipt of the appraisals, VIHHFC made an offer to purchase the buildings only. Dr. Gardiner testified that the offer was not made in good faith since he had already made clear that the buildings would only be sold if the business was also purchased.

¶7     Commissioner Encarnacion testified that she advised Dr. Gardiner that she had gotten Pafford to agree to continue to provide staffing services. She explained that Pafford would recover those costs upon the sale of the business/ buildings while allowing sale negotiations to continue beyond October 5, 2023. Unsatisfied with the negotiations, on October 3, 2023, Dr. Gardiner issued notice to Ray Fonseca, Chairman of the Committee of Health, Hospital and Human Services for the 35th Legislature of the Virgin Islands notifying of his intent to cease providing dialysis services at any of his facilities effective Saturday, October 7, 2023 at 5:00p.m., because the parties

---

[6] Addendum I, Scope of Work, page 10-11 of the Outsourcing Contract between VIHHFC and CKC.

[7] Addendum I, Scope of Work, page 10-11 of the Outsourcing Contract between VIHHFC and CKC.

[8] Addendum I, Scope of Work, page 14 of the Outsourcing Contract between VIHHFC and CKC.

[9] Addendum I, Scope of Work, page 13 of the Outsourcing Contract between VIHHFC and CKC.

[10] See testimony of Mr. Finch and Commissioner Encarnacion. Mr. Gardiner also testified that VHHHFC did not transfer any patients to CKC per the Contract.

[11] Addendum I, Scope of Work, page 10 of the Outsourcing Contract between VIHHFC and CKC.

[12] Hearing Testimony of Mr. Finch.

have not come to a permanent solution to address the dialysis challenges of CKC.[13] A copy was provided to the Governor of the Virgin Islands, Commissioner Encarnacion, Mr. Finch (for VIHHFC), CMS representatives and the CEOs for JFHL and the Schneider Regional Medical Center. Among other actions taken, Government responded with filing for TRO[14].

¶8    Through the testimony of Commissioner Encarnacion, the Government established that it is responsible for "ensuring adherence to regulations and laws relating to the health of the People of the Virgin Islands and maintenance of health care standards."[15] As a condition to operate a dialysis facility in the territory, private and public dialysis facilities must comply with federal and state laws and regulations governing the Centers for Medicaid and Medicare Services ("CMS"). Some of those conditional requirements, as stated in the Complaint and supported by Commissioner Encarnacion's testimony, can be found in 42 CFR §494.20 and 42 CFR § 494.180.

¶9    § 494.20 requires as a condition to operate a dialysis facility in the territory, that service providers comply with all applicable federal, state, and local laws, including regulations governing the Centers for Medicaid and Medicare Services (CMS).[16] 42 CFR § 494.70(b) requires that dialysis facilities provide 30 days advance notice of any involuntary discontinuation of services. 42 C.F.R. § 494.180 mandates a patient discharge plan and patient transfer policies and procedures. Commissioner Encarnacion and Mr. Finch stated that CKC's contract includes language that requires "compliance with the CMS standards for notification of patients and transfer of care, prior to closure, as well as adherence to standards of the profession."[17]

¶10    The Government's Verified Complaint against CKC and Dr. Walter Gardiner MD, proceeds under the Government's claim of *parens patriae* authority for anticipatory breach of contract by CKC's failure to conform to the conditions of participation established by CMS and made a part of its authority to conduct a dialysis facility, and of the VIHHFC July 21, 2021 outsourcing contract.

## LEGAL STANDARD

¶11    A preliminary injunction is not issued lightly. It has been described as "an extraordinary and drastic remedy" which should be granted only "upon a clear showing that the plaintiff is entitled to such relief."[18] The Court must consider four factors when determining whether to issue a preliminary injunction and make specific findings as to each. These factors are:

(1) whether the movant has shown a reasonable probability of success on the merits;
(2) whether the movant will be irreparably harmed if a preliminary injunction is not entered;
(3) whether the nonmoving party will suffer even greater harm were preliminary relief be granted; and

---

[13] Hearing Exhibit 1, October 3, 2023, letter to Ray Fonseca, Chairman of the Committee on Health, Hospital and Human Services of the 35th Legislature of the Virgin Islands ("This communication, therefore, is to inform you that CKC will no longer be able to continue and will cease services at 5 p.m. on October 7, 2023.").

[14] See Hearing Testimony of Commissioner Encarnacion.

[15] The testimony of Commissioner Encarnacion is that this responsibility lies with the Commissioner of Health, on behalf of the Government.

[16] 42 C.F.R. § 494.20.

[17] See also, Hearing Exhibit A, p.10 & 11.

[18] See, Yusuf v. Hamed, 59 V.I. 841, 847 (V.I. 2013) (quoting Munaf v. Geren, 553 U.S. 674, 689-90 (2008)).

(4) whether granting preliminary relief in the public interest. [19]

¶12    The Court's analysis must also employ the "sliding scale test" in considering the four factors.[20] This test recognizes that a strong showing does not need to be made on all factors. A movant may be successful with a strong showing on the "imminent and irreparable harm" factor with a weaker showing on the meritorious claim factor.[21]

¶13    As discussed below, the Court is satisfied that the Government made at least a minimal showing of all these factors. While the weight of the evidence on some factors was lower than others, the sliding scale test allows for a balancing of those factors most weighty as the Court considers whether maintaining the status quo will result in the better option.

## ANALYSIS

¶14    Before addressing each factor, however, the Court must first be satisfied that the Government has a standing to maintain this action. The Government claims to maintain this action as *parens patriae* to the citizens of the Virgin Islands who benefit from renal dialysis care by the Defendants. While Defendants did not challenge this standing at the hearing[22], a determination that the Government may proceed under the theory of *parens patriae* must be made before the Court can proceed to the meritoriousness of the claims, harm to the parties and public interest.

### The Government's Standing to Sue Under *Parens Patriae*

¶15    The *parens patriae* action has its roots in the idea that the sovereign has the prerogative, right and responsibility to protect its citizens who are unable to protect themselves. [23]  It is an authority inherent in every sovereign regardless of statutory law.[24] "[T]he Territory of the Virgin Islands has attributes of autonomy similar to those of a sovereign government or a state, therefore the Government of the Virgin Islands may bring suits as *parens patriae* in appropriate circumstances".[25]

¶16    This authority to bring suits *parens patriae* has been recognized by the Supreme Court of the Virgin Islands. In family Court proceedings, the Supreme Court has found *parens patriae* authority "separate and distinct from a purely statutory authority to protect the interest of a minor. [26] This is the only recent decision where the Court expounded upon the Government's *parens patriae* authority. Otherwise, it is addressed with a cursory reference as an option to recover civil fines by the Superior Court in *Government of the Virgin Islands v. ServiceMaster*, LLC, 72 V.I. 114, 128 (Super. November 27, 2019). Hence, there is little guidance on the scope and parameters to its application outside of precedent decided before the Virgin Islands Supreme Court was vested

[19]  Bassil v. Klein, 75 V.I. 19, 27-28 (V.I. Super. 2021).

[20]  See, 3RC & Co. v. Boynes Trucking Sys., 63 V.I. 544, 553 (V.I. 2015).

[21]  Yusuf v. Hamed, 59 V.I. @ 856.

[22]  The Court understands that the Defendants' challenge to Government's standing relates to its authority to actually enforce the federal statutes and/or regulations relative to Medicaid and Medicare outside of parens patriae since the Defendants offered no argument challenging the Plaintiffs' parens patriae authority.

[23]  *Mormon Church v. United States*, 136 U.S. 1, 57 (1890).

[24]  *Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592, 600 (1982).

[25]  *Mathes v. Century Alumina Co.*, 2008 U.S. Dist. LEXIS 90087, at *1 (D.V.I. 2008).

[26]  *Tutein v. Arteaga*, 60 V.I. 709,716 (V.I. 2014)

with the authority to shape Virgin Islands laws.[27]  While these cases may recognize the prior Courts' willingness to adopt the *parens patriae* doctrine, the full scope and limitation of the Government's authority under this doctrine is yet to be addressed by our Supreme Court.  Hence, the Court shall look to the Third Circuit Court of Appeals for guidance on the parameters of *parens patriae* authority as it applies to the issue of enjoining the closure of a private facility and the protection of citizens who may be harmed by the closure.

¶17    The U.S. Supreme Court has stated that p*arens patriae* involves "more than the state stepping in to represent the interests of particular citizens who, for whatever reason, cannot represent themselves but extends to the impact of the discrimination under the Immigration Act on the island's economy."[28]  As defined by the Third Circuit, a *parens patriae* suit, by definition, involves the government as the real party in interest and not just a nominal party."[29]  To maintain *parens patriae* standing, the state must show a direct interest of its own and not merely to seek redress for injury to private parties.[30]  "The State must assert an injury to what is characterized as 'quasi sovereign' interests."[31]  "The right of the state to sue as *parens patriae* encompasses suits either brought to protect its proprietary interests or brought to protect quasi-sovereign interests such as the health, comfort and welfare of its citizens and general economy of the state.[32]

¶18    The substance of the Government's claim is that the Defendants, who operate a health care facility which provides "end-stage renal dialysis services," is threatening to abruptly cease operations. The Government contends that such an action will critically jeopardize the health and welfare of all the people who rely on those services particularly as the Government's own facilities are not equipped to accommodate the volume of patients in the Virgin Islands who would require that those services be provided daily. It further contends that the potential harm is compounded by the fact that the patients did not receive notice of the closure, underscoring its need to intervene and prosecute this action on behalf of those patients. This interest in seeking redress for the CKC dialysis patients is elevated by its quasi-sovereign interest in protecting the health and welfare of its citizens and regulation of the health industry in the territory.

---

[27] The District Court has also upheld the Government's *parens patriae* authority over property it holds in public trust separate and distinct from the interest of individual citizens. It has been found that the Government can sustain a parens patriae action to enjoin harm to the natural resources of the territory as harm to the Government and the members of the public. *Mathes v. Century Alumina Co.,* 2008 U.S. Dist. LEXIS 90087, at *29 (D.V.I. 2008). The Territorial Court also recognizes parens patriae authority even in those instances where it finds constitutional and other limitations on its exercise. For example, the Department of Education has parens patriae authority in relation to student conduct although the Fourth Amendment applies to restrict a school's search of a student in the absence of probable cause. *Gov't of the In Re M.S.,* 17 V.I. 289, 295 (Terr. Ct. 1981). The Court has also recognized the Government's *parens patriae* authority to act in the interest of the mentally incompetent but found that the "fundamental right of a person to be secure in the ability to procreate," limited the exercise of parens patriae authority to determine whether a mentally incompetent person could be sterilized. In the Matter of the Sterilization of A.B., 1985 V.I. LEXIS 40 *6-7 (Terr. Ct. 1985).

[28] *Alfred L. Snapp & Son, 458 U.S.* @ 600.
[29] *Allegheny Gen. Hosp. v. Phillip Morris,* 228 F.3d 429, 436-37 (3rd Cir. 2000).
[30] *Pa. by Sheppard v. Nat'l Ass'n of Flood Insurers,* 520 F. 2d 11, 22 (3rd Cir.1975).
[31] *Alfred L. Snapp & Son* 458 U.S. @ 601.
[32] *Pa. by Sheppard v. Nat'l Ass'n of Flood Insurers, 520 F.2d 11* @ 21-22.

¶19     The Government asserts that the Defendants have contractual obligations to its citizens under a service agreement. "Service agreements" constitute contracts, notwithstanding that a formal contract is not required.[33]     The Government further contends that the Defendants have statutory obligations to its citizens who are protected under the regulations governing the Centers for Medicaid and Medicare Services ("CMS"). The statutory obligations are created under 42 C.F.R. and mandates certain notice requirements and the implementation of transition policies and procedures to ensure that the rights of the patients being serviced are protected. Witness testimony establishes that the Commissioner of Health is the local Government head charged with monitoring compliance. The Government therefore has a direct interest of its own which buttresses its interest in protecting its citizens.

¶20     It is irrelevant that the laws sought to be influenced by the Government are federal regulations over which it has no direct enforcement authority, so long as the citizens are afforded the benefit of those federal rules and regulations.[34]     For example, in recognizing Puerto Rico's *parens patriae* authority, the U.S. Supreme Court in *Alfred L. Snapp & Son v. Puerto Rico* found that discrimination against Puerto Rican migrant farm workers under the Wagner-Peyser Act, 29 U.S.C. 49 et seq., and the Immigration and nationality Action of 1952, 8 U.S.C. 1101 et seq., adversely affected the workers and Puerto Rico's economy.[35]     In this case, the federal rules and regulation at issue are those that govern CMS, but their application and benefit to the citizens of the Virgin Islands are conditional to the operation of any dialysis facilities in the territory. The abrupt closure of the Defendant's facilities will not only put a significant number of Virgin Islands citizens at substantial risk of harm which may include the loss of life, but it will suddenly overburden the Government's resources in the short term with catastrophic effect. This adverse effect is sufficient to trigger the Government's authority to protect its citizens and protect its sovereign interest in regulating health care in the territory. Therefore, the Court finds that the Government of the Virgin Islands, through the Commissioner of Health and the Attorney General of the Virgin Islands, does have standing to act on behalf of Virgin Islands citizens who require and utilize outpatient renal dialysis care from the Defendants.

## Evidentiary Basis for Issuance of a Preliminary Injunction

¶21     The Court will next consider whether the Government has met their burden of showing, by clear and convincing evidence, that a Preliminary Injunction should be granted. In so doing, the Court will determine whether there is a plausible claim(s), the harm to the parties and the public interests under the "sliding scale" standard.

---

[33] *Gov't of the V.I. v. The ServiceMaster Co., LLC*, 72 V.I. 114, 133 (Super. Ct. 2019).

[34] See *Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592, (1982) (finding that the Commonwealth of Puerto Rico has *parens patriae* authority to bring an action to ensure that its citizens receive the benefits of the Immigration and Nationality Act, 8 USC § 1101 et. seq. and the Wagner-Peyser Act, 29 USC § 49 et. seq.)

[35] *Alfred L. Snapp & Son*, 458 U.S.at 600

### A. Reasonable Probability of Success on the Merits

¶22    To obtain a preliminary injunction, the Government has to show that they have at least one plausible claim.[36]  A plausible claim is established by the moving party showing a reasonable chance, or probability, of winning."[37]  This does not translate to a showing that the movant will actually prevail at trial but that its success is "more likely than not."[38]  That is left for the jury as the ultimate arbiter of the factual issues presented in the case.[39].  Instead, the movant need only make out a prima facie case on the claim(s) alleged by introducing evidence supporting each element of the causes of action.[40]

¶23    In this case, the Government filed two claims for anticipatory breach. Count One relates to a breach of the unwritten "agreement" between the Government and CKC that CKC will comply not only with applicable Virgin Islands law but with the CMS rules and regulations attendant to the operation of a dialysis facility in the Virgin Islands. The second count alleges an anticipatory breach of the July 21, 2021 GHHFC Outsource Contract.

¶24    After an extensive *Banks*[41] analysis, the Superior Court previously adopted the doctrine of anticipatory breach of contract stated in Restatement (Second) of Contract § 253(2).[42] This Court adopts the analysis of the Superior Court in *Urh v. Buffo, supra*. § 253 of the Restatement (Second) of Contract provides, in relevant part, that "[w]here performances are to be exchanged under an exchange of promises, one party's repudiation of a duty to render performance discharges the other party's remaining duties to render performance."  Essentially, a material breach by one party justifies the other party's refusal to perform under the contract. The repudiation must "be an unqualified refusal, or a declaration of inability to perform his contractual obligations."[43]  Mere refusal to perform upon a mistake or misunderstanding of facts or upon an erroneous construction of a contract term does not amount to repudiation.[44] An indication of an intent to repudiate may be found in "an unequivocal manifestation" that  the nonmoving party will not perform "when the time fixed for it in the contract arrives."[45]

---

[36] *Marco St. Croix, Inc. V. V.I. Hous. Auth.*, 62 V.I. 586, 590 (V.I. 2015).

[37] *3RC & Co. v. Boynes Trucking Sys.*, 63 V.I. 544, 554.

[38] *Id.*

[39] *Id.*

[40] *Yusuf*, 59 V.I. @ 849.

[41] *Banks v. International Leasing and Rental Corp.,55 V.I. 967 (V.I. 2011)*. A *Banks* analysis requires a Court to consider the following factors 1) whether any Virgin Islands Courts had previously adopted a particular rule; (2) the position taken by most Courts from other jurisdictions; and (3) most importantly, which approach represented the soundest rule for the Virgin Islands.

[42] *Urh v. Buffo*, 2018 WL 1020673, at *6–8 (V.I. Super. Feb. 20, 2018), *rev'd in part on reconsideration,* 2021 VI SUPER 51U (V.I. Super. May 18, 2021).

[43] *Urh v. Buffo*, 2018 WL 1020673, at *6.

[44] Id.

[45] Id.

¶25    The anticipatory claims in Counts One and Two implicate basic breach of contract principles. To establish breach of contract, a party must show that (1) a contract existed (2) that created a duty (3) which was breached (4) causing harm or damages to the party.[46]

### 1. There is a Plausible Claim of Anticipatory Breach of CMS Regulations and Injury to Plaintiff and the Patient Beneficiaries.

¶26    The Government claims anticipatory breach of the CMS requirements for the operation of a dialysis center. Through witness testimony, the Government showed that CKC has service agreements to provide ESRD dialysis services to at least 120 citizens of the Virgin Islands. Implicit in the service agreements is the authority to provide ESRD dialysis services to the citizens of the territory in accordance with the CMS laws from which CKC benefits. The Court is satisfied that those agreements with the patients are conditioned on CKC's compliance with CMS regulations. Commissioner Encarnacion testified that the operation of any dialysis center requires certification from CMS.[47] Even public facilities (the hospitals) must comply with CMS regulations. Dr. Gardiner testified that CKC, the only privately owned service provider of dialysis services for ESRD patients in the territory, was benefiting from Medicare and Medicaid with payments for services rendered to its patients. On October 3, 2023, Dr. Gardiner and CKC sent notice to Plaintiffs that they intended to close their dialysis facilities. This was the first indication that those service agreements were in jeopardy. The unequivocal language in the letter is that CKC will be closing at 5pm on October 7, 2023, and ceasing to provide dialysis services at its facilities. The arbiter of fact can find that the notice reveals an intent to breach the patients' contracts for services.

¶27    The witness testimony at the hearing sustains the required minimal showing that CKC would violate three CFR regulations on CMS compliance conditions for the performance of dialysis services. 42 CFR § 494.20 states, "Compliance with Federal, State, and local laws and regulations. The facility and its staff must operate and furnish services in compliance with applicable Federal, State and local laws and regulations pertaining to licensure and any other relevant health and safety requirements."[48] Consistent therewith, "the dialysis facility must inform patients (or their representatives) of their rights (including their privacy rights) and responsibilities when they begin their treatment and must protect and provide for the exercise of those rights.[49] Additionally, the ESRD facility must follow written patient discharge and transfer policies and procedures in the event that the facility ceases operation, inclusive of an advance 30 day notice of the planned discharge to the patient and local ESRD Network." [50]

¶28    Witness testimony[51] and the affidavit of one patient of CKC[52] establishes that this anticipatory breach is compounded by the failure of CKC to give its patients notice of CKC's intent to cease providing dialysis services, as required by 42 CFR 494.180(f). Additionally, a plan to

---

[46] *Government of the Virgin Islands Department of Health v. United Industrial Service Transportation Professional and Government Workers of North America*, 2019 WL 8883551 (VI Super 12/16/2019)

[47] See, Hearing testimony of Commissioner Encarnacion.

[48] 42 CFR § 494.20. See also, Paragraph 26, Plaintiff's Verified Complaint.

[49] 42 CFR 494.70. See also, Paragraph 27, Plaintiff's Verified Complaint.

[50] 42 CFR 494.180(f). See also, Paragraph 28, Plaintiff's Verified Complaint.

[51] Commissioner Encarnacion and Mr. Finch testified to the CMS requirements to which CKC (and the public hospitals) must comply to provide ESRD dialysis services.

[52] Exhibit 3 to Plaintiff's Memorandum in support of Motion for Preliminary Injunction.

transition CKC's patients to another service provider was not presented to the patient(s) as required by 42 CFR 494.70. This anticipated breach of the service agreement of CKC would result in harm to the 120 current patients of CKC. CKC's patients would be left without consistent and continual services while the Government scrambles to meet the sudden increase in dialysis outpatients left stranded without a transition plan. Witness testimony further proves that any interruption in the current services received by CKC's patients could result in serious bodily injury as dangerous toxins accumulate in their bodies leading to death.

¶29    A showing of the existence of a contract, a breach of the contract, and injury to the Plaintiffs, *parens patriae*, has been clearly established on the record. The Court finds a plausible claim of anticipatory breach of CMS regulations.

### 2. There is Evidence of a Breach of the VIHHFC Outsourcing Contract, but only minimal evidence of an injury to the Plaintiffs or the Patient Beneficiaries of the Contract.

¶30    The Government also claims an anticipatory breach of the VIHHFC Outsourcing Contract dated July 26, 2021.[53] This written contract requires CKC to "provide high quality hemodialysis care services that meet all of the requirements of Renal Network 3 and the Centers for Medicare and Medicaid Services ("CMS") without interruption" to "the present outpatients of the Gov. Juan F. Luis Hospital and Medical Center (Hospital" or "JFLH") and its soon to be closed outpatient ESRD Hemodialysis unit."[54] Witness testimony established that the current number of patients in the outpatient ESRD Hemodialysis Unit was 40.[55] Witnesses also established that, consistent with the terms of the contract, the Government would facilitate the transition of the patients to CKC based upon a written transition plan to be approved by CMS.[56] The transition of patients was to occur "on an agreed upon timeline by both JFLH and CKC upon execution of this contract."[57] Notwithstanding that there was no evidence of an agreed upon transition plan as anticipated by the Contract or that CMS approved the transition plan for the JFLH outpatient dialysis patients, the Court notes that the Contract provides that the transition of each patient was also conditioned upon each patient's "signed consent to allow JFLH to provide their medical records to CKC as part of the transition."[58] Commissioner Encarnacion and Mr. Finch testified that none of the patients would sign a consent to the transfer of their records. Hence, JFLH has not transferred any patients to date.[59]

¶31    Nonetheless, the Government claims that the October 3, 2023 letter[60] notifying of a closure of CKC's dialysis facilities constitutes a breach of CKC's contractual obligations to provide services to JFLH's outpatient dialysis patients. Witness testimony established that the contract terminates on July 31, 2026. The Contract does not provide a timeline by which patients must be transitioned and therefore the July 31, 2026 termination date establishes the period by which a

---

[53] See, Hearing Exhibit A- contract for Professional Services dated July 26, 2021.

[54] Hearing Exhibit A, page 10.

[55] Hearing Testimony of Commissioner Encarnacion and Mr. Finch.

[56] Hearing Exhibit A, page 12-13.

[57] Hearing Exhibit A, page 12

[58] Hearing Exhibit A, page 14.

[59] See Testimony of Commissioner Encarnacion and Mr. Finch.

[60] Hearing Exhibit 1, October 3, 2023 letter

patient of JFLH may be transitioned to CKC and CKC would be expected to perform under the contract. By giving notice of the closure of its facility, CKC was in effect ending its obligation to service patients that may be transitioned from JFLH's outpatient dialysis unit within the term of the contract. This is equivalent to an unequivocal manifestation of CKC's intent not to honor the terms negotiated in the July 26, 2021 Outsource Contract. Moreover, CKC has not given the required notice of intent to terminate the Contract.[61] The Court therefore finds that the Government has shown an anticipatory breach of the July 26, 2021 Contract.

¶32     The next inquiry is whether the Government submitted *prima facie* evidence on the element of injury or harm because of the anticipatory breach. The answer to this question is a bit more challenging for the Court as the Government's evidence of harm for breach of the written contract is minimal. At best, the evidence is that in the absence of the negotiated option for the transition of consenting outpatient dialysis patients, the government must continue servicing its outpatient dialysis patients which it already services. There is no evidence that a patient was in the process of transition. Such evidence may have allowed for a stronger showing of harm as that transition process would have to be halted and the benefit delayed. Hence, while there is a showing of a contract and anticipatory breach, a showing of injury is weak. Thus, the court finds that the proof of a meritorious claim factor for breach of the July 26, 2021 Contract is weak.

## B. Irreparable Harm to the Movant

¶33     The moving party's chance of succeeding on the merits is evaluated in combination with the moving party's claim of injury.[62] The Supreme Court of the Virgin Islands has confirmed that "irreparable harm" is the primary factor that a moving party must demonstrate in order to succeed on a motion for preliminary injunction.[63] The Court's finding of irreparable harm must also include a finding that the irreparable harm is "certain and imminent harm for which a monetary award does not adequately address."[64] This imminent and irreparable harm must also be likely to result without an injunction.[65]

¶34     Where the risk of irreparable harm to the moving party is substantial, the showing of a likelihood of success on the merits may be weaker.[66] However, if the likelihood of success on the merits is very strong, a showing of irreparable harm is less decisive.[67] In this case, the Government has shown "imminent and irreparable harm" which the Defendant did not dispute.

¶35     Justa Encarnacion, Commissioner of the Department of health, who is also a Registered Nurse, testified that she has experience with treating end stage renal dialysis patients. She testified that renal dialysis is necessary for persons whose kidneys can no longer adequately clean the buildup of toxins in the blood. The treatment must be given at least three times a week and the

---

[61] Mr. Finch testified that VIHHFC has not been provided adequate notice of the planned closure, which under its contract with the Defendants, require 90 days prior written notice with cause and 180 days prior written notice without cause under paragraph 16 of the Contract. See, Hearing Exhibit A, page 4.

[62] 3RC & Co. V. Boynes Trucking Sys., 63 V.I. @ 554.

[63] Id. @ 555

[64] Id. @ 556.

[65] Hansen v. Virgin Islands Water and power Authority, 55 V.I. 309, 314 (V.I. Super. Ct. 2011).

[66] 3RC & Co. V. Boynes Trucking Sys., 63 V.I. @ 555.

[67] Id. @ 556.

treatment process can last as long as three hours for each treatment. Patients denied this treatment have no other medical option and will die, she said. Dr. Gardiner, who himself has over 40 years' experience working with ESRD patients, did not dispute the Commissioner's description of the care necessary and dire consequences in the absence or delay of that care.

¶36    Dr. Gardiner's testimony corroborated the testimony of Commissioner Encarnacion and Mr. Finch of VIHHFC that CKC is the only outpatient private provider of renal dialysis services in the Virgin Islands. Commissioner Encarnacion and Mr. Finch testified the Juan F. Luis Hospital and the Schnieder Regional Hospital and Medical Center provide public inpatient and limited outpatient renal dialysis services. These public hospitals do not have the current facilities and staffing to accommodate an immediate increase in the number of patients that would require outpatient renal dialysis care were CKC to close. Mr. Finch provided even greater detail, explaining that there are currently forty-two (42) outpatient dialysis patients receiving services at the Juan F. Luis Hospital and seventy-two (72) at the Schnieder Regional Hospital and Medical Center. "The capacity is full" at each hospital, Mr. Finch testified. He added, "accommodating more outpatients would require identifying and preparing a new/ different location for dialysis treatment, guaranteeing proper water treatment through regular testing before services can begin to meet CMA requirements, additional staffing, equipment, and supplies. Additionally, currently the number of shifts at each hospital needs to change. He concluded by stating that it would take six (6) months to "fill out" a new location, and even on an emergency basis, at least ninety days (three months) would be needed.

¶37    When queried about the alternatives available were CKC permitted to close, Commissioner Encarnacion stated that arranging for off island care would require more time and even then, may still not be available to many who do not have insurance and off-island accommodations. Commissioner Encarnacion also stated that the patients of CKC did not receive advance notice of the closure as is required by certain CMS regulations that would ensure that patients are not blindsided with the involuntary termination of services, and left scrambling with minimal options outside of a proper plan for transfer of services. Finally, Mr. Finch stated that options to expand the hospitals' services or bring in another private outpatient provider may take as long as nine (9) months.

¶38    The Court is satisfied that a clear showing has been made that in the absence of the outpatient renal dialysis services provided by the Defendants and adequate time to prepare to accommodate the influx of patients needing dialysis care on an outpatient basis at the hospitals, the patients will suffer in the short term an unacceptable fate: death or serious bodily injury as the toxicity in their blood increases to dangerous levels. This serious threat to life meets the "imminent and irreparable harm" factor.

¶39    When the "imminent and irreparable harm" factor is evaluated in combination with the moving party's claim of injury, the scale slides further in favor of the granting of a preliminary injunction. The Court therefore finds that plaintiffs (dialysis patients) will suffer irreparable harm if the preliminary injunction is not granted.

**Irreparable Harm to the Nonmoving Party**

¶40    The Court must also determine whether the nonmoving party will be irreparably harmed were an injunction issued.[68] Even if the moving party successfully demonstrates a substantial risk of irreparable harm if no injunction is granted, this "'must be balanced against any similar risk to the other party in the light of the chance of each party to succeed on the merits.'"[69] The Supreme Court has stated that a strong showing on the merits with a weaker showing of irreparable harm, may still weigh in favor of injunction where the harm to the nonmovant is similarly low.[70] The ultimate aim of the Court is to maintain the *status quo*, which by itself, is not considered "irreparable harm."[71]

¶41    Defendants argue that were this preliminary injunction ordered, they would face a substantial risk of financial irreparable harm. Dr. Gardiner testified that neither he nor CKC can afford the cost of adequate staffing since the depletion of the Legislature's July 24, 2023 grant of $700,000.00 on October 5, 2023. The government fundings was intended to offset its staffing and operational costs pending resolution of the parties' negotiation for the sale and purchase of Defendants' dialysis business and associated properties in the Virgin Islands to the Government of the Virgin Islands. Dr. Gardiner further testified that CKC no longer had the funds to pay its staff after October 5, 2023 and he was not confident that the Government was negotiating in good faith and may not intend to purchase his business. He explained that after he rejected the Government's offer to purchase his properties, on October 5, 2023, he met with Commissioner Encarnacion to try to resolve the issues and they "made some progress". He communicated the progress to CMS, and memorialized into a proposed agreement what he understood were the terms agreed upon. Dr. Gardiner testified that he signed the proposed agreement and submitted it to JFLH, but they refused to sign. He concluded his statement by saying "without a signed agreement, I am not rescinding anything," referring to his October 3, 2023, letter threatening to cease operations at 5:00 p.m. on October 7, 2023. Dr. Gardiner also testified that the arrangement for payment to Pafford in the future was not guaranteed given the Government's apparent lack of interest in finalizing an agreement to purchase his business.

¶42    Staffing was the primary concern emphasized by the Defendants as increasing their risk of irreparable harm. Dr. Gardiner testified that staffing through Pafford is prohibitive without outside financial assistance. "CKS can't operate without outsource staff," he stated. As an example, Dr. Gardiner explained that a traveling RN's hourly pay is approximately $130.00 an hour while a local RN is paid approximately $60.00 an hour. Dr. Gardiner explained that the pool of local Registered Nurses is limited or nonexistent and consequently, in the past he has had to rely on travel nurses. However, under current circumstances, he states that he cannot afford the cost to hire qualified nurses and other staff. On cross examination, Dr. Gardiner admitted that CKC has been billing the patients' health insurance carriers and Medicaid/ Medicare for services provided to his patients.

---

[68] Yusuf, 59 V.I. @ 856.

[69] 3RC & Co. v. Boynes Trucking Sys., 63 V.I. @ 544, 555.

[70] Yusuf, 59 V.I. @ 856.

[71] SBRMCOA, LLC, v. Morehouse Real Estate Invs. LLC, 62 V.I. 168, 202 (V.I. Super. Ct. 2015).

*Government of the Virgin Islands, et al. v. Health Quest, LLC., et al.*
Case No. SX-2023-CV-00354
**MEMORANDUM OPINION and ORDER**
Page 14 of 16

Cite as 2023 VI Super 63U

¶43     Upon consideration of the evidence, the Court finds that the option for Pafford to continue to provide staffing with delayed compensation is unsubstantiated in the record. While Commissioner Encarnacion provided hearsay testimony on these arrangements, the Government could have introduced testimony from a Pafford witness on Pafford's commitment to that arrangement. Nonetheless, by Dr. Gardiner's testimony, the record sustains that CKC bills and receives payments from Medicare, Medicaid and health insurers for services provided to CKC's patients. This revenue was in addition to the funding provided by the Covid19 grant and VI Legislature's grant award. Defendants have not shown that these revenue sources which they have relied upon from the inception of CKC's dialysis operations are now insufficient to sustain the payment of the increased costs for staffing and supplies.

¶44     Additionally, witness testimony supports that from the 2019 COVID grant award to October 5, 2023, CKC's staffing expenses were covered by other sources. There are no indicia of evidence that CKC's normal revenue stream, which covered all costs of the business before Covid19,[72] abated during and post Covid19. Dr. Gardiner's testimony is that his monthly staffing expense was about $60,000.00. There is no explanation for how $700,000 grant awarded on June 2023 from the VI Legislature was fully depleted by October 5, 2023, such that there are no funds available for staffing. The Court cannot infer from what is not in the record, and therefore finds that Defendants have not sustained their burden of showing by clear and convincing evidence that they will suffer irreparable harm were the TRO not lifted. Whereas increased costs may be burdensome, there is no evidence that the increased costs in this case have resulted in irreparable financial harm to the Defendant.

¶45     As is the case here, where there is not as strong a showing on the merits of at least one claim, a strong showing of "imminent and irreparable" harm to the movant and a weak showing of harm to the nonmovant, the Court is satisfied that under the sliding scale, its consideration must weigh in favor of an injunction, particularly when the public interest is factored in.

## C. The Public Interest

¶46     The *Yusuf*[73] Court has also guided that the Court should seek to prevent the parties from halting specific acts presumptively benefitting the public until the merits can be reached, and a determination made as to what justice requires.[74] The Territory has one privately owned, fully operable outpatient dialysis treatment facility operating on St. Croix and St. Thomas, which is capable for servicing its current patients totaling 120, and up to at least another 40 transferees (based upon the July 26, 2021 Outsourcing Contract.) In contrast, it is evident that the public health facilities on St. Thomas and St. Croix are not prepared to accommodate a sudden increase in its outpatient dialysis pool to provide immediate outpatient dialysis treatment for end stage renal dialysis patients. Maintaining the *status quo* not only allows the public health facilities to prepare, but allows adequate time, under CMS regulations, for the affected patients to be notified and a transfer plan implemented. Renal dialysis is a critical and urgent health care service to those who need it. The public interest is best served by the continuation of those services and the legal

---

[72] See Hearing testimony of Dr. Gardiner regarding the challenge of the business being the limited availability of staffing and with the advent of Covid19, the associate high costs of imported staff.

[73] Yusuf v. Hamed, 59 V.I. 841 (V.I. 2013).

[74] Yusuf, 59 V.I. @ 858.

compliance by those facilities which provide them. Finally, the Government's responsibility to ensure qualified healthcare services for the citizens of the territory should not be sidestepped for private interests whose injury, when measured against the public concerns, is insubstantial.

### Criminal Liability under 34 V.I.C. § 469

¶47    Since it was raised by the Plaintiffs as a further reason for the Government's interest in requesting the TRO, the Court will address and dismiss from its consideration the Government's allegation of criminal conduct. The Government alleges that Defendants have "… threatened to abandon [their] patients in violation of 34 V.I.C. § 469 (the Elder and Dependent Adult Abuse Prevention Action ("Act"). They appear to claim that under *parens patriae*, it must also protect the patients of CKC from conduct that violates Virgin Islands law, namely the abandonment of elderly patients. This Court agrees that its *parens patriae* authority extends to protection of Virgin Islands citizens under statutory law and under the appropriate circumstances, but the Court will not make that determination as it finds that there is not a clear showing of criminal violation under 34 V.I.C. § 469.

¶48    § 469(b) provides that "[a] person being a caregiver who commits the offense of criminal abuse or neglect of an elder or dependent adult… and it results in serious bodily injury or death of the person abused or neglected is guilty of felony aggravated criminal abuse or neglect of an elder or dependent adult punishable by a term of imprisonment not less than 3 year nor more than 14 years."[75] In answering the question of whether CKC and/or Dr. Gardiner may even be criminally responsible under § 469, it must first be determined that one or both Defendants fall within the definition of "caregiver". Defendants maintain that they are not caregivers, but rather care custodians, and cannot be charged under this statute.

¶49    A "caregiver" is defined as "a person who provides direct care for elderly people, or the dependent adult."[76] In contrast, a "care custodian" is an administrator or an employee of any of a public or private facility or agency, who provide care or services for elder and dependent adults.[77] The Government has not shown by clear and convincing evidence that Defendants are caregivers within the meaning of § 452(g). if the Defendants are correct that they are care custodians and not caregivers, § 469's criminal penalty, applicable only to caregivers[78], is inapplicable to the Defendants. It follows that there can be no authority under *parens patriae* or statute to pursue a charge impermissible by law.

### Conclusion

¶50    All TRO factors considered, the Court finds that the Government, under their *parens patraei* authority, has made a reasonable showing of plausible claims and a strong showing of irreparable and imminent harm. The Court further finds that the Defendant's risk of harm is low

---

[75] 34 V.I.C. § 469.

[76] 34 V.I.C. § 452(g).

[77] 34 V.I.C. § 452(e).

[78] § 469(b) provides, "A person being a caregiver who commits the offense of criminal abuse or neglect of an elder or dependent adult…and it results in serious bodily injury or death of the person abused or neglected is guilty of felony aggravate criminal abuse or neglect of an elder or dependent adult punishable by a term of imprisonment not less than 3 years nor more than 14 years.: 34 V.I.C. § 469(d).

and cannot override the weight of the first two factors. Finally, there is a strong public interest in ensuring that the proper procedures are followed as required by CMS for the transfer of dialysis patients and that the public hospitals are prepared to accommodate the influx of new patients under a contemplated plan by the CMS regulations and Virgin Islands law.

Accordingly, it is hereby,

**ORDERED** that the Government's request for **Preliminary Injunction** against Defendants Walter Gardiner MD and Health Quest LLC d/b/a Caribbean Kidney Center is **GRANTED**. It is further,

**ORDERED** that the Preliminary Injunction shall remain in effect **for ninety (90) days** from October 16, 2023. It is further,

**ORDERED** that during the ninety (90) days of this preliminary injunction, the parties, in accordance with their respective legal responsibilities, shall ensure that all dialysis patients of Walter Gardiner MD and Health Quest LLC d/b/a Caribbean Kidney Center receive notice of the intended closure, a transfer plan is implemented, and the public facilities ready themselves to service an increased number of outpatient renal dialysis patients and/or exercise such other dialysis care options as are available, consistent with Medicaid & Medicare statutes and regulations and the laws of the Virgin Islands. It is further,

**ORDERED** that a copy of this Order shall be served upon each of the parties through their respective counsel.

**DONE AND SO ORDERED** this _3/_ day of October 2023.

**HON. YVETTE ROSS-EDWARDS**
Judge of the Superior Court

**A T T E S T:**

**TAMARA CHARLES**
**Clerk of the Court**

By:_____
    Court Clerk
Dated:_____